**Harry F. STONE, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 197, Docket 34990.

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 1970.

Decided Nov. 19, 1970.

Before CLARK, Associate Justice,[*] LUMBARD, Chief Judge, and KAUFMAN, Circuit Judge.

IRVING R. KAUFMAN, Circuit Judge:

The single question before us on this appeal from the denial of Stone's motion to vacate his judgment of conviction under 28 U.S.C. § 2255 is whether the admission of incriminating pretrial statements by Stone's two codefendants at their joint trial for interstate transmission of an extortionary threat was harmless error.[1] Applying the standard of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we find that the admission of those statements was "harmless beyond a reasonable doubt." Because we affirm on this ground, we will elucidate the evidence in some detail.

## I.

At about the hour of eight on the evening of June 4, 1968, the appellant, Harry Stone, a resident of Keene, New Hampshire, paid a call at the isolated summer home of Mrs. Edith Aborn, a 90-year-old widow, in Shrewsbury, Vermont. He represented himself as one Richard Childs and stated that he had been retained as attorney for the parents of a 15-year-old boy whom Mrs. Aborn's son Marcellus Parker had been seen molesting. Stone went on to say that his clients had instructed him to press criminal charges unless Mrs. Aborn paid $50,000 in compensation. Mrs. Aborn was outraged by Stone's proposal, as was Parker, who arrived home during Stone's confrontation with his mother. Stone persisted for several hours in his attempt to convince them of

Laurence T. Sorkin, New York City, for appellant.

George W. F. Cook, U. S. Atty., D. Vt., for appellee.

---

[*] United States Supreme Court, retired, sitting by designation.

[1.] Stone did not raise at his trial the claim he now makes in his § 2255 proceeding. Because we find the errors committed at his trial to be harmless under the standard applicable on review of a claim that has been preserved at trial, we need not decide the inviting question whether the knowledgeable-waiver standard of Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963) and Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), applies to our review of unpreserved issues or a discretionary standard akin to the "plain error" approach of F.R.Crim.P. 52(b).

the seriousness of the matter, but having no success, departed at midnight.

Stone's threat to press charges against Parker was not a complete surprise to Mrs. Aborn, however. Shortly before moving to Shrewsbury from her winter residence at the Berwick Hotel in Rutland, Mrs. Aborn had received a telephone call from a man who had similarly demanded $50,000 as attorney for the parents of a boy her son had allegedly accosted. At trial Mrs. Aborn identified that voice on the telephone as Stone's.[2]

The night following Stone's visit, two men again knocked on the door of the Shrewsbury residence, but Mrs. Aborn and her son refused to admit them. The men rapped on the windows and beamed their flashlights into the house. Parker identified Stone [3] as stating that he was an attorney retained to press sex-offender charges against Parker and also claiming that the man accompanying him was a State's Attorney prepared to order Parker's arrest. Stone further announced to the Aborns that the parents of the allegedly molested boy had decided that they were ready to accept a payment of $3,400 instead of the $50,000 previously demanded. The intended victims remained steadfast in their refusal to meet the demands. They were told, however, that they would be visited again the following afternoon by someone ready to receive the $3,400.

Mrs. Aborn telephoned the police early on the morning of June 6. She told them of the extortion threats, and said that she expected the visitors to return later in the day. Sergeant Robert Richardson of the Vermont State Police and FBI Special Agent James Mee were present in Mrs. Aborn's home when she received the first of four telephone calls from the Northampton, Massachusetts residence of Stone's codefendant Donald Leroux. By prearrangement with Mrs. Aborn, one of the officers overheard each of these calls. In the first, Stone's other codefendant Forrest Poland identified himself as a Mr. Rider, the State's Attorney, and told Mrs. Aborn that $25,000 would be required to forestall her son's prosecution for lewd and lascivious conduct with the 15-year-old boy. Five minutes later Poland called again, identified himself once more as State's Attorney Rider, and dropped his demand from $25,000 to $10,000.

Shortly after noon Poland made his third call, again posing as Mr. Rider. He related that upon consultation with Mr. Childs (the fictitious lawyer played by Stone), it had been determined that the aggrieved parents would drop their charges upon payment of $3,400, said to represent "the court costs and lawyer's fees and that." Mrs. Aborn remained unmoved, prompting Poland to make a fourth call at 1:50 p.m. As Mr. Rider, he reiterated the seriousness of the penalties attached to molesting a 15-year-old boy and warned that "they were all done fooling around." At the suggestion of the officers, Mrs. Aborn stated that she would pay the $3,400. Poland said that a Deputy Sheriff would arrive at 4:30 to accept the payment and would deliver simultaneously a "release."

At 4:00 p.m. Poland called a fifth time, from a pay station in Wallingford, Vermont, to confirm that the Deputy Sheriff would be arriving in one-half hour. At the appointed time, Leroux appeared at the Aborn home, appropriately furnished with a water pistol and a "Matt Dillon, U.S. Marshal" badge. Upon hearing Leroux identify himself as the Deputy Sheriff who had come to collect the money, officers Richardson and Mee emerged from hiding and placed him under arrest. During the arrest Leroux tore documents soon discovered to be duplicate typewritten "release" forms, agreeing to drop charges against Parker. The "release" appeared to have

2. This conversation occurred in May or June, Mrs. Aborn testified, but "probably" in May. Stone was incarcerated in Westmoreland, N. H. from March 1 to June 1.

3. Parker identified Stone's voice. In a pretrial statement, codefendant Poland alleged that he and Leroux were the two men who visited the Aborn house on June 5.

been drawn up by "Richard Childs, Attorney-at-Law," and signed in that name. The typewritten settlement figure of $50,000 had been inked out and replaced with $3,400.

Leroux then readily revealed that Poland was in the woods nearby, where Special Agent Mee shortly apprehended him. At the station house that evening, an inspection of Poland's wallet revealed a Massachusetts driver's license, an apprentice plumber's license, a Selective Service Certificate, and a Social Security card, all issued to one Richard L. Childs.

Stone was apprehended in New Hampshire shortly thereafter, and a joint trial before Judge Gibson and a jury followed for interstate transmission of an extortionary threat and for conspiracy. 18 U.S.C. §§ 371, 875(d). The jury returned guilty verdicts on both counts as to all three defendants. Stone was sentenced on October 15, 1968 to two years in prison on the conspiracy count, and to an additional three years' probation on the substantive count. He never appealed from his conviction. Later he petitioned the trial court for postconviction relief under 28 U.S.C. § 2255. From Judge Gibson's denial of his petition without a hearing, Stone prosecuted this appeal.

II.

■ Stone does not now seriously challenge the admissibility of the evidence summarized above.[4] The basic dispute before us concerns certain testimony by Sergeant Richardson and Special Agent Mee, in which they related postarrest admissions by Poland and Leroux. The substance of these statements was that Poland, Leroux, and Stone had agreed to pose as State's Attorney, Deputy Sheriff, and the aggrieved parents' attorney, respectively, in order to extort substantial sums from Mrs. Aborn. Poland, who had learned that Mrs. Aborn was a lady of some means when he trimmed her trees in 1967, had solicited the aid of the other two. The statements elicited by Richardson and Mee and repeated by them on the witness stand also established that Poland and Leroux had waited outside the Aborn house on the night of Stone's first visit, and that the three of them had returned to Leroux's Northampton, Massachusetts home following the visit.

■ The government acknowledges that under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the admission of these incriminating statements by non-testifying co-defendants (none of the defendants testified) violated Stone's right to confront and cross-examine the witnesses against him. It urges, however, that the admission was harmless beyond a reasonable doubt, Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and that accordingly Stone's judgment of conviction should not be vacated.

■ After a careful review of the entire record, we agree with this contention. The properly admitted evidence establishing a three-party conspiracy to extort was close to irrefutable. The alleged specific offense by Mrs. Aborn's son was the subject of discussion in every contact commencing with Stone's telephone call to the Berwick Hotel in late May to Leroux's appearance to col-

---

4. Stone argues that admission of the "release" forms was error under Bruton v. United States, *infra*. He acknowledges, however, that coconspirator's hearsay evidence is admissible if offered to show the existence of the conspiracy rather than the truth of the statement's contents. Lutwak v. United States. 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L.Ed. 593 (1953),; United States v. Marquez,

424 F.2d 236, 239 (2d Cir.), cert. denied, 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (U. S. Oct. 12, 1970). And here there was substantial independent untainted evidence to establish Stone's participation in the conspiracy. See United States v. Bentvena, 319 F.2d 916, 949 (2d Cir.), cert. denied sub nom. Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963).

lect the $3,400 on June 6. Stone also referred to the "State's Attorney" on June 5, and Poland, the "State's Attorney," referred to "Mr. Childs," Stone's alias, in the third telephone call on June 6. Stone forecast the time of Leroux's arrival at the Aborns (approximately 4:30 p.m.) and Leroux carried papers signed "Richard Childs." Stone first suggested the unusual sum of $3,400 on June 5, which was Poland's final offer on the 6th, and Poland carried a set of identification cards made out in the name of Richard Childs. With all this evidence properly before the jury, Poland's statements to the officers that the three of them had agreed to extort money from Mrs. Aborn, and that they had been together on the night of the 4th, was thin icing on a very substantial cake.

We are aware that Stone, Poland, and Leroux were not indicted on conspiracy or substantive counts of extortion but on counts relating to the transmission in interstate commerce of extortionary communications. To establish the requisite mens rea, the prosecution was required to prove that Stone could reasonably anticipate Poland's calls from outside Vermont. See United States v. Corallo, 413 F.2d 1306, 1324 and n. 4 (2d Cir.), cert. denied, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 422 (1969); United States v. Crimmins, 123 F.2d 271, 272 (2d Cir. 1941). We have recently stated that such knowledge of coconspirators' interstate activity may be inferred from a conspirator's central role in the joint undertaking, and that the strength of the inference varies with the party's proximity to the core. United States v.

Corallo, 413 F.2d at 1326–1327. When the properly admitted evidence is compared with the challenged evidence in this more carefully defined context, the harmlessness of the *Bruton* errors becomes still clearer. If the questioned evidence had any effect upon the jury's estimate of Stone's rank in the conspiracy, it would, if believed, diminish rather than increase his role. Poland's account of the conspiracy tended to indicate that rather than being an initiator, planner, and manager, Stone was assisting him.[5]

The effect of an error is to be gauged by "the probable impact of the [statements] on the minds of an average jury." Harrington v. California, 395 U. S. 250, 254, 89 S.Ct. 1726, 1728, 23 L. Ed.2d 284 (1964). We believe beyond a reasonable doubt that the jury would not have reached a different verdict solely on the basis of the properly admitted evidence.

Affirmed.

LUMBARD, Chief Judge (concurring):

As Judge Kaufman's opinion thoroughly and convincingly demonstrates, there is no merit to Stone's claim of constitutional error in the admission at trial of incriminating pretrial statements made by Stone's codefendants. I concur in affirming the judgment of the district court. However, in doing so, I wish to point out that there may well be a serious question as to whether Stone has any standing to be heard in a proceeding under 28 U.S.C. § 2255. From all that appears in the record be-

---

5. Stone lived in New Hampshire when the first telephone call was made to the Berwick Hotel. It will be recalled that Stone undertook the first two contacts with Mrs. Aborn and her son. It was he who on June 5 apparently set the June 6 meeting time and who named the eventual figure of $3,400. On June 6, Poland again offered that figure ostensibly only after Stone's approval, and Poland and Leroux presented themselves as acting on Stone's ultimate behalf in collecting the money.

The evidence that Stone had returned to Leroux's home in Northampton on the evening of June 4 (from which the interstate telephone calls originated two days later), would appear to have no impact on the inference that Stone anticipated that interstate calls would be made to Mrs. Aborn, unless we accept the rather fanciful supposition that when Stone saw Leroux's telephone in Northampton it sparked a thought that had not occurred to him before.

fore us, Stone never objected to these statements at trial, and he chose not to appeal from the judgment of conviction. At the time of trial Mrs. Aborn, the principal complainant, was 90 years old. Where there may be reason to retry a criminal case, it is crucial to require that relief be sought without delay by timely objection and direct appeal.

I do not believe that any holding of the Supreme Court compels hearing Stone's claims. There is no "grisly choice" between accepting life imprisonment or facing retrial and a possible death sentence if an appeal were successful, as was true in Fay v. Noia, 372 U.S. 391, 439–440, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963). In Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), while introduction of the illegally-seized evidence had not been objected to immediately, objections were raised by the close of the government's case and an appeal was taken. The court never reached the question of whether this state procedural default could bar federal review on habeas corpus, but merely indicated that the matter would be open in a later proceeding. In Kaufman v. United States, 394 U.S. 217, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969), objection was made at trial to an unlawful search and seizure and, despite some confusion between petitioner and his newly-appointed counsel, the appellate court was notified, after oral argument, that this claim was being made.