**UNITED STATES of America,**
**Appellee,**

v.

**Frank CANGIANO et al.,**
**Appellants.**

**Nos. 592-4, 618-19, Docket 71-2104-8.**

United States Court of Appeals,
Second Circuit.

Argued March 9, 1972.

Decided June 26, 1972.

Philip Vitello, New York City (Joseph L. Belvedere, Brooklyn, N.Y., and Henry J. Boitel, New York City, on the brief), for appellants Frank Cangiano, Cosmo Cangiano and Dominick Ariale.

Philip Brown, Brooklyn, N.Y., for appellants Thomas Gambardella and Anthony DeRamo.

James A. Pascarella and Ronald De-Petris, Asst. U. S. Attys., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., and David G. Trager, Asst. U. S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before FRIENDLY, Chief Judge, TIMBERS, Circuit Judge, and JAMESON,* District Judge.

TIMBERS, Circuit Judge:

These appeals call upon us to decide difficult questions under the First and Fourth Amendments arising in the context of a prosecution for transporting obscene materials in interstate commerce for the purpose of sale.

Appellants Frank Cangiano, Cosmo Cangiano, Ariale, Gambardella and De-Ramo appeal from judgments of conviction entered after a twelve day jury trial in the District Court for the Eastern District of New York, Jacob Mishler, Chief Judge, finding them guilty of transporting obscene materials in interstate commerce for the purpose of sale and conspiring to do so, in violation of 18 U.S.C. §§ 1465 and 371 (1970).[1] Their principal contentions on appeal relate to the legality of various searches and seizures conducted by the FBI in gathering evidence against appellants. The district court considered these claims and, after conducting a lengthy pre-trial suppression hearing, concluded that appellants' Fourth Amendment rights had not been violated. For the reasons stated below, we affirm.

## I.

A brief recitation of the events culminating in appellants' indictment is necessary to an understanding of our rulings on the claims raised on appeal.

In the latter part of 1968, three reliable informers told FBI Agent Monaghan that Frank and Cosmo Cangiano were engaged in a widespread pornography enterprise, placing large quantities of obscene materials in interstate commerce. Agent Monaghan was informed that the store located at 5309 New Utrecht Avenue in Brooklyn was being used in the operation of that enterprise. According to the informants, Frank and Cosmo Cangiano shipped the obscene materials by air freight in cardboard boxes or footlockers approximately one foot in cubic size and used fictitious consignors. The informants also told Monaghan that there were several buildings in the vicinity of 5309 New Utrecht which were used as warehouses for vast quantities of obscene books, magazines, decks of playing cards and reels of film. Moreover, in October of 1968, Agent Monaghan observed an individual whom he had arrested two months before on charges of interstate shipment of obscene materials leave the premises at 5309 New Utrecht Avenue.

The information provided by the informants was corroborated in part by a surveillance of 5309 New Utrecht instituted by FBI agents in January of 1969. During this period of surveillance, the agents regularly observed various individuals, including Frank and Cosmo Cangiano, Ariale and Gambardella, going in and out of the building carrying cardboard boxes similar to the ones described by the informants. On one occasion, agents followed Ariale to

---

* Senior District Judge of the District of Montana, sitting by designation.

1. Appellants and five co-defendants were named in a six-count indictment. The first count charged all ten defendants with conspiring to violate 18 U.S.C. § 1465. The five remaining counts charged substantive violations of § 1465.

  Frank, Cosmo, Gambardella and Ariale were found guilty on all six counts. Frank and Cosmo were sentenced to concurrent five year terms of imprisonment, and Cosmo was fined $30,000. Ariale and Gambardella received suspended sentences and were placed on probation for two years. DeRamo was found guilty on counts one, two and six, the only counts in which he was named. He was fined $5,000 and placed on probation for two years.

  Co-defendants Betty Margo, Howard La-Groux and Dante Boccaccio were acquitted on all counts in which they were named. Co-defendant Mattio LaVilla was found guilty on the conspiracy count and acquitted on count three. Steve Margo was acquitted on the conspiracy count, but found guilty on count five. LaVilla did not appeal, and Margo has withdrawn his appeal.

4723 New Utrecht Avenue and filmed him as he entered and left the premises carrying footlockers. This building later proved to be a warehouse for the obscene materials.

On at least two occasions, agents saw appellant Gambardella deliver packages to the Emery Air Freight office at John F. Kennedy International Airport. The waybills accompanying the packages on both occasions designated the items being shipped as printed matter and bore the names and addresses of consignors whom the FBI checked and determined were fictitious. Agent Monaghan subsequently contacted officials at Emery Air Freight and advised them that the name and address of the consignor on the packages were fictitious and that he had reason to believe that the contents of the packages were other than as indicated by the "consignor". Acting on this information, an official of Emery Air Freight opened and inspected the packages. When the Emery official discovered that some of the packages contained reels of film, he requested, and was supplied by Agent Monaghan with, a movie projector. After viewing the films, the Emery official informed the agent that the packages contained obscene materials.

Relying on the informants' information, the surveillance of the premises at 5309 New Utrecht, the Emery official's inspection (and a similar inspection by officials of United Air Lines) and a reel of film purchased by one of the informants from Cosmo Cangiano and viewed by Commissioner Max Schiffman, Agent Monaghan secured arrest warrants for Frank and Cosmo Cangiano, Ariale and Gambardella and search warrants for 5309 and 4723 New Utrecht Avenue.

On February 6, 1969, agents entered 5309 New Utrecht and arrested Cosmo Cangiano, Ariale and Gambardella. The search of the premises uncovered invoices and purchase orders, telephone books, a list of names and telephone numbers, and a deck of obscene playing cards. A search also was conducted at 4723 New Utrecht. This building turned out to be a warehouse for obscene materials, including playing cards, magazines, photographs and reels of film.

Almost simultaneously, agents arrested Frank Cangiano at an apartment in Brooklyn. The agents searched the apartment and seized a large quantity of obscene materials, including playing cards, magazines, photographs, and reels of film, as well as a composition book and Emery Air Freight waybills.

Also on February 6, 1969, FBI agents in Pittsburgh arrested appellant DeRamo on the premises of DeRamo Furniture Manufacturing Company. Acting pursuant to a search warrant secured largely on the basis of the Emery official's inspection of packages shipped from New York and addressed to DeRamo, the agents seized four packages which bore Emery Air Freight identification numbers. An examination of the contents of these packages uncovered large quantities of obscene materials, including reels of film, decks of playing cards, photographs and magazines.

II.

Appellants' first contention is that there was no probable cause for the various arrest and search warrants. Appellants essentially claim that these warrants were based in large measure on the inspections conducted by officials of Emery Air Freight and United Air Lines and that these inspections were so connected with governmental participation as to constitute federal searches which violated their Fourth Amendment rights. Since we hold that these inspections were not governmental searches within the protection of the Fourth Amendment, we do not decide whether the information provided by the three reliable informers and the agents' own observations supplied the requisite probable cause for the issuance of the warrants.

The facts surrounding the inspection by the Emery official are as follows.[2] On February 4, 1969, Agent Monaghan advised officials at Emery Air Freight that he had reason to believe that several packages delivered by Gambardella and co-defendant Boccaccio to Emery for shipment contained matter other than as indicated by the consignor and that the name and address of the consignor on the packages were fictitious. A district manager of Emery then removed the packages to a conference room and opened them. The agents were not present when these packages were opened. The Emery official found that the packages contained magazines and reels of film. The official then requested and received a movie projector from the FBI and viewed the films. He then reported to Agent Monaghan that the films were obscene. The packages were then resealed and forwarded to their destinations. One such destination was the DeRamo Furniture Manufacturing Company in Pittsburgh.

■ The district court's conclusion that this inspection was not so infused with governmental participation as to constitute a federal search is amply supported by the record. As the court found, "[t]he government agents did not say what they thought the contents were, did not request the inspection, were not present, and did not participate in the inspection." Moreover, by examining the contents of the packages, Emery was merely acting in accordance with well established regulations. Item 24 of the Official Air Freight Rules, Tariff No. 1–B, provides that "[a]ll shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection." Furthermore, Tariff No. 2 of the Rules and Regulations of the Emery Air Freight Corporation provides that "[a]ll shipments are subject to inspection by the Forwarder." The inspection therefore was conducted by private officials pursuant to their duty as common carriers to insure that the packages did not present a danger. It would have been irresponsible for the Emery official not to have inspected the packages when confronted with reliable information that the contents were mislabeled and that the name and address of the consignor were fictitious.[3] Thus, while the initial stimulus to inspect came from the FBI and Emery undoubtedly did not wish to incur disfavor, Emery had its own reasons for examining the contents of the packages.

We dealt with a similar situation in United States v. Blum, 329 F.2d 49 (2 Cir.), cert. denied, 377 U.S. 993 (1964), where we held that an inspection by a carrier was not a government search. There the initial suspicion came from the carrier, but aside from the fact that the stimulus to inspect in the instant case came from the FBI, the extent of governmental participation in *Blum* was greater than the federal participation in the instant inspection. Indeed, the

---

2. This opinion will consider only the inspection by the Emery official. The inspection by the officials of United Air Lines was similar to the one conducted by the Emery official. In view of the fact that either inspection by itself, when considered in conjunction with the agents' observations and the informants' information, would provide the requisite probable cause, we need consider only one such inspection. Moreover, the parties in their appellate briefs have dealt almost exclusively with the initial inspection by an Emery official on February 4, 1969.

3. This sufficiently answers appellants' argument that by informing the Emery official only that the packages were mislabeled and failing to reveal the further fact that they were suspected actually to contain obscene materials, the government agents created the misimpression that the contents of the packages were dangerous and thereby coerced the official into searching the packages. Even if the suspicions of the government agents had been disclosed, such a disclosure would not have been adequate to satisfy the overriding concern for the safety of the common carrier which mandated that the Emery official search the fictitiously labeled and addressed packages to determine their true contents.

search itself was conducted by government officials in *Blum*. Moreover, similar to the right which Emery reserved to itself, we noted in *Blum* that the carrier had a right to inspect the package:

> "We find no merit in the claim of an unreasonable search and seizure. R.E.A. had a right to open the carton and examine the contents which were misdeclared on the waybill . . . under the right reserved in R.E.A.'s express classification." 329 F.2d at 52.

A decision by the Ninth Circuit also lends support to our conclusion that the inspection by the Emery Air Freight official was not a government search. In *Gold v. United States*, 378 F.2d 588, 591 (9 Cir. 1967), in holding that the defendant's Fourth Amendment rights had not been violated by an airline official's inspection of a package, the court said:

> "Unlike Corngold, here the agents did not request that the package be opened, and they were not present when it was opened. The agents had the same right as any citizen to point out what they suspected to be a mislabeled shipping document, and they exercised no control over what followed. What did follow was the discretionary action of the airline's manager and was not so connected with governmental participation or influence as to be fairly characterized, as was the search in Corngold, as a 'federal search cast in the form of a carrier inspection.' "

There is nothing in Corngold v. United States, 367 F.2d 1 (9 Cir. 1966), upon which appellants rely, which requires a different result. There, as the court in *Gold* pointed out, the federal agents requested that the package be opened. Moreover, not only were the agents present at the opening, but they also actively participated in the opening of the packages. In short, the extent of governmental participation in the *Corngold* search is not comparable to the governmental participation in the inspection conducted by the Emery official.

■ Accordingly, since the inspection by the Emery official was legal, there clearly was more than adequate probable cause to support the arrest and search warrants issued on February 6, 1969.[4]

### III.

Appellants next contend that the search warrant issued for 5309 New Utrecht was defective, as it failed to describe with sufficient particularity the items to be seized.[5]

■ A fundamental protection afforded by the Fourth Amendment is that a search warrant must sufficiently describe the items to be seized so as to prevent a mere roving commission. Marron v. United States, 275 U.S. 192, 196 (1927). Moreover, the specificity requirement is more stringent where, as here, First Amendment rights are involved. Stanford v. Texas, 379 U.S. 476, 485 (1965). In United States v. Marti, 421 F.2d 1263, 1268 (2 Cir. 1970), cert. denied, 404 U.S. 947 (1971), we held that a warrant "essentially direct[ing] the executing officers to seize any materials found by them to be in violation of the New York obscenity laws" was invalid and that the generality of the warrant could not be cured by the specificity of the affidavit.

---

4. On February 6, 1969, the FBI secured arrest warrants for all of the appellants and search warrants for 5309 New Utrecht, 4327 New Utrecht and the premises of DeRamo Furniture Manufacturing Company in Pittsburgh. At the pre-trial suppression hearing, DeRamo challenged the search warrant for his business premises on the same grounds as the appellants challenged the other search warrants— the illegality of the inspection at Emery's New York office.

5. The search warrant issued for 4723 New Utrecht was not more specific than the one issued for the store at 5309 New Utrecht. Nevertheless, none of the appellants objected to the search and seizure at 4723 New Utrecht, as they all denied having any contact with those premises.

■ It is difficult to see how the search warrant in the instant case is distinguishable from the one in *Marti*. Here the warrant described the property to be seized as:

"reels of 8 millimeter film, playing cards, books, magazines, photographs and other similar material which are obscene, lewd, lascivious and filthy as defined under Section 1465, Title 18, United States Code . . . ."

Similar to the search warrant in *Marti*, this warrant merely parroted the statutory language. Moreover, assuming that this were a situation where the generality of the warrant could be cured by the specificity of the affidavit, the vice remains, as the affidavit "gave no guidelines to the officers as to what is obscene and what is not." United States v. Marti, *supra*, 421 F.2d at 1268.

■ Nevertheless, even if the warrants were defective due to their failure to describe with sufficient particularity the items to be seized, the seizures were valid as incident to the arrests of Cosmo Cangiano, Ariale and Gambardella. The search and seizure at 5309 New Utrecht occurred prior to the Supreme Court's decision in Chimel v. California, 395 U.S. 752 (1969), which is not to be applied retroactively. Williams v. United States, 401 U.S. 646, 651 (1971). Thus, the legality of this search and seizure must be determined on the basis of pre-*Chimel* law. Here, with the exception of a few bathing suits, all of the items seized were found in the front room of the premises at 5309 New Utrecht, the very room in which Cosmo Cangiano, Ariale and Gambardella were arrested. Accordingly, there can be no doubt that these items were lawfully seized as incident to their arrests under pre-*Chimel* standards. See United States v. Bennett, 409 F.2d 888, 895 (2 Cir. 1969), cert. denied sub nom. Haywood v. United States, 396 U.S. 852 (1970). Moreover, it is clear that allegedly obscene materials, even though First Amendment rights are involved, can be lawfully seized without a warrant, provided that one of the exceptions to warrantless intrusions is applicable. United States v. Wild, 422 F.2d 34, 37–38 (2 Cir. 1969), cert. denied, 402 U.S. 986 (1971); United States v. Marti, *supra*, 421 F.2d at 1269–70.

## IV.

Frank Cangiano next argues that the search of his apartment was too extensive to be justified as incident to his arrest.

Law enforcement officers arrested Frank Cangiano in the front room of his apartment in Brooklyn. They then proceeded to conduct a thorough search of the four-room apartment. This search uncovered a large quantity of obscene materials, as well as a composition book, counterfeit bills and Emery Air Freight waybills. The search was conducted by four law enforcement officers and lasted approximately two hours and forty-five minutes. During this period, however, there were numerous interruptions, and time was consumed by making an inventory of the large number of items seized.

As previously noted, this search was conducted prior to the Supreme Court's decision in Chimel v. California, *supra*, which is not to be applied retroactively. Williams v. United States, *supra*, 401 U.S. at 651. Accordingly, the legality of the search incident to Frank Cangiano's arrest is controlled by the pre-*Chimel* standards of United States v. Rabinowitz, 339 U.S. 56 (1950), and Harris v. United States, 331 U.S. 145 (1947).

■ We are unable to perceive how the extent of the search of Frank Cangiano's apartment exceeded what was permitted in Harris v. United States, *supra*. There the Supreme Court held that a warrantless search of a four-room apartment for the purpose of finding two stolen checks was lawful as incident to the arrest of the accused, even though the search lasted for five hours and was conducted by five FBI agents. The search in the instant case was neither more extensive in area nor longer in duration than the one sanctioned by *Har-*

*ris.* Moreover, as in *Harris*, the nature of the crime charged made it possible that evidence or instrumentalities of the crime could be concealed in a nook or cranny of any one of the four rooms or closets. See Harris v. United States, *supra*, 331 U.S. at 152.

We are strengthened in our view that this search was permissible under pre-*Chimel* standards by the Supreme Court's recent decision in Williams v. United States, *supra*, 401 U.S. at 650 n. 2. There the Court upheld a pre-*Chimel* search of a four-room apartment for the purpose of finding marked bills, where the search was conducted by six law enforcement officers and lasted for over an hour.

We see nothing in Von Cleef v. New Jersey, 395 U.S. 814 (1969), which requires a different result. In that case the accused was arrested on the third floor of the 16-room house in which she lived. Several policemen then proceeded to search the entire house for a period of three hours. As the Supreme Court said, "The action of the police here in combing a three-story 16-room house from top to bottom and carting away several thousand papers, publications, and other items cannot under any view of the Fourth Amendment be justified as 'incident to arrest.'" 395 U.S. at 816. It is obvious that the extent of the search of Cangiano's apartment is factually distinguishable from that involved in *Von Cleef*.

## V.

Appellants' next contention is that the seizures of the allegedly obscene materials were massive and that the absence of a prior adversary hearing determining their obscenity required the suppression of the materials at their trial. Before considering the merits of this argument, however, it is important to note the seizures to which this claim applies. First, there was no massive seizure of obscene materials at 5309 New Utrecht. The agents seized only a deck of playing cards and one reel of film. Secondly, as previously indicated, none of the appellants objected to the search and seizure at 4723 New Utrecht, even though that search did result in what might be called a massive seizure of obscene materials. Thirdly, appellant DeRamo did not object in a timely fashion to the seizure at his business premises in Pittsburgh. Thus, the claim relating to the failure to conduct a prior adversary hearing relates only to the seizure of the materials at Frank Cangiano's apartment.

▆▆▆▆ Turning to the merits of this issue, the Supreme Court has held that prior to a massive seizure of allegedly obscene books, an adversary hearing must be conducted to determine their obscenity. A Quantity of Books v. Kansas, 378 U.S. 205, 210–11 (1964). See also Marcus v. Search Warrant, 367 U.S. 717, 735–36 (1961). Such a prior adjudication of obscenity is necessary to insure that the public is not deprived of its First Amendment right to unrestricted access to non-obscene books and magazines. As the Court said in A Quantity of Books v. Kansas, *supra*, 378 U.S. at 213, "if seizure of books precedes an adversary determination of their obscenity, there is danger of abridgement of the right of the public in a free society to unobstructed circulation of non-obscene books." In Bethview Amusement Corporation v. Cahn, 416 F.2d 410, 411–12 (2 Cir. 1969), cert. denied, 397 U.S. 920 (1970), we held that the seizure of one print of an allegedly obscene motion picture intended for public showing is analogous to the seizure of a large number of books and violates the First Amendment unless preceded by a determination of obscenity. Accord, Astro Cinema Corp., Inc. v. Mackell, 422 F.2d 293, 295 (2 Cir. 1970). Moreover, where seizure of allegedly obscene materials is not preceded by a procedure which affords a reasonable likelihood that non-obscene materials will reach the public, the allegedly obscene materials must be returned to those from whom they were seized. Astro Cinema Corp., Inc. v. Mackell, *supra*, 422 F.2d at 296.

■ At the same time, it is clear that not every seizure of allegedly obscene materials must be preceded by an adversary determination of obscenity. In United States v. Wild, *supra*, 422 F.2d at 39, we indicated that a prior adjudication of obscenity is not required where, after a lawful arrest, a few samples of allegedly obscene materials are seized as evidence for use in a subsequent criminal prosecution. We thereafter explained our holding in *Wild*, as follows:

> "We view *Wild* as merely saying that a particularized search for specific samples of slicks or publications, designed to provide evidence for a subsequent obscenity prosecution, and not substantially restraining distribution of the material involved, does not violate *Marcus* or *A Quantity of Books*." Astro Cinema Corp., Inc. v. Mackell, *supra*, 422 F.2d at 296.

In the instant case, the government argues, and Judge Mishler found, that the absence of a prior adversary hearing did not abridge the public's First Amendment right to unrestricted circulation of non-obscene materials, as the seizure of the materials at Cangiano's apartment was merely a particularized search for specific samples designed to provide evidence for a subsequent prosecution and did not substantially obstruct distribution of the materials involved. However, in light of the fact that all the copies of various books, magazines and films were seized, it is questionable whether the seizure at Cangiano's apartment can be viewed as non-massive. Nevertheless, even assuming that there was an undue infringement of First Amendment rights, we reject appellants' contention that this infringement required the suppression of the materials seized at the subsequent obscenity prosecution.

■ As previously indicated, the seizure of the materials at the apartment did not violate Frank Cangiano's rights under the Fourth Amendment. Moreover, there is nothing in the Fourth Amendment which prohibits putting a distributor of filthy books, magazines and films temporarily out of business. There being no infringement of Frank Cangiano's rights under the Fourth Amendment, there is no occasion to invoke the exclusionary rule, whose primary purpose is to deter unreasonable searches and seizures.

■ The absence of a violation of the Fourth Amendment does not mean, of course, that the seizure of the items at Cangiano's apartment did not abridge the public's First Amendment right to access to non-obscene materials. However, where seizure of allegedly obscene materials is not preceded by a procedure which affords a reasonable likelihood that non-obscene materials will reach the public, the proper remedy is the return of the allegedly obscene materials to those from whom they were seized, not suppression of these items at a subsequent obscenity trial.[6]

A recent opinion by Judge Leventhal of the District of Columbia Circuit supports our view that the abridgement of the public's First Amendment right to unobstructed circulation of non-obscene materials did not require suppression of the items seized from Cangiano's apartment at appellants' trial. In Huffman v. United States (D.C.Cir.1971), 10 Crim. L.Rptr. 2076, the court held that the seizure of allegedly obscene magazines, without a prior adversary determination of obscenity, constituted an undue infringement of First Amendment rights. The court upheld, however, the district court's refusal to suppress the magazines at the subsequent obscenity trial:

> "[W]e agree with the courts that have held the exclusionary rule inapplicable where, as here, the seizure is invalid because of the requirement of

6. In the instant case, appellants never requested the return of the materials seized. Even if they had, it would have been permissible for the government to retain

a few samples of the material, for use as evidence at the subsequent trial. See United States v. Wild, *supra*, 422 F.2d at 39.

adversary hearing, since the primary right involved is the public's First Amendment right of access rather than the defendant's Fourth Amendment immunity from unreasonable search and seizure. The courts have simply required the Government to return the publications to their owners, conditioning the return on the owner's making copies of the publications available as evidence in future criminal prosecutions."

See also United States v. Manarite, 314 F.Supp. 607, 610 (S.D.N.Y.1970), aff'd on other grounds, 448 F.2d 583 (2 Cir.), cert. denied, 404 U.S. 947 (1971). Furthermore, while this Court has not specifically decided whether allegedly obscene materials seized in violation of the First Amendment should be suppressed at a subsequent obscenity trial, language in Bethview Amusement Corp. v. Cahn, *supra*, 416 F.2d at 412, and in Astro Cinema Corp., Inc. v. Mackell, *supra*, 422 F.2d at 296, buttresses our conclusion that the exclusionary rule is inapplicable in this situation. In both of these cases, we discussed ways in which the government could secure copies of films for use as evidence in an obscenity prosecution, even though the films had to be returned to their owners prior to trial because they had been seized in violation of the First Amendment.

Thus, assuming that seizure of the items at Frank Cangiano's apartment violated *A Quantity of Books* and *Marcus*, we hold that the district court properly refused to suppress these items at the trial.

### VI.

Gambardella also maintains that the evidence against him was insufficient to support the jury's verdict. However, viewing the evidence in the light most favorable to the government, as we must at this juncture, Glasser v. United States, 315 U.S. 60, 80 (1942), the evidence adequately supported Gambardella's conviction. He was observed two times entering and leaving the premises at 5309 New Utrecht carrying cardboard boxes. Moreover, on these occasions Gambardella delivered these boxes to the Emery Air Freight office at the airport. By merely looking at the waybills on the boxes, he must have known that the name and address of the consignor were fictitious. Gambardella also evinced a consciousness of guilt by signing a waybill at the Emery office with a fictitious name. Additional circumstantial evidence that Gambardella knew what the packages contained is provided by the fact that items seized at 5309 New Utrecht indicate that the packages were wrapped on the premises. Under the circumstances, we hold that there was sufficient evidence to convince the jury beyond a reasonable doubt that Gambardella was guilty as charged. We also note that the jury did acquit co-defendant Boccaccio, who had been observed transporting packages to the airport, but who had not signed a fictitious name to a waybill, thus indicating the jury carefully considered the evidence against each defendant in reaching its verdict.

DeRamo also argues that the seizure of the materials on his business premises at the time of his arrest violated his rights under the Fourth Amendment. DeRamo, however, did not raise this issue at the lengthy pre-trial suppression hearing. His failure to present this claim in a timely fashion constitutes a waiver of his objection to the seizure. F.R.Crim.P. 41(e); 3 Wright, Federal Practice & Procedure 111–14 (1969). In any event, there is no merit to this claim.

Appellants also contend that 18 U.S.C. § 1465 is unconstitutional insofar as it prohibits the shipment in interstate commerce of obscene material for the purpose of sale to consenting adults. We rejected this argument in United States v. Manarite, 448 F.2d 583 (2 Cir.), cert. denied, 404 U.S. 947 (1971), and see no need to reconsider it now.

Finally, appellants contend that the district court erred in upholding the va-

lidity of the search of Cosmo Cangiano's automobile outside the premises at 5309 New Utrecht. However, since none of the items uncovered as a result of this search were introduced in evidence at trial, we are not required to pass on the legality of this search.

Affirmed.