**UNITED STATES of America,
Appellee,**

v.

**Cosmo "Gus" CANGIANO and Elana
Marie Isola, Appellants.**

**Nos. 1120, 1121, Dockets 73–1360, 73–1449.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 17, 1973.

Decided Jan. 11, 1974.

------◆------

William M. Piatt, Atty., Dept of Justice, Washington, D. C. (Robert A. Morse, U. S. Atty., Eastern District of New York, Robert L. Keuch, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

Henry J. Boitel, New York City (Martin N. Gamliel, New York City, of counsel), for appellant Cangiano.

Phylis Skloot Bamberger, New York City (Robert Kasanof, The Legal Aid Society, New York City), for appellant Isola.

Before MULLIGAN, OAKES and TIMBERS, Circuit Judges.

MULLIGAN, Circuit Judge:

On June 30, 1971, a two-count indictment was filed in the Eastern District of New York, naming Cosmo Cangiano, Elana Marie Isola, Anthony Palumbo and Anthony C. Mascola as defendants. The first count charged the defendants with conspiracy "to transport in interstate commerce for the purpose of sale and distribution obscene, lewd, lascivious and filthy motion picture films, pictures, books and pamphlets" in violation of 18 U.S.C. §§ 371 & 1465. The second count charged Cangiano, Palumbo and Isola with the substantive crime of transporting from Staten Island, New York to New Jersey, some "ninety reels of obscene, lewd, lascivious and filthy eight-millimeter motion picture films, for the purpose of sale and distribution therein," in violation of 18 U.S.C. § 1465. The indictment was tried before Hon. Jacob Mishler, Chief Judge, Eastern District of New York, and a jury. The charge against Mascola was dismissed on the motion of the Government. On October 27, 1972, the jury returned a guilty verdict on both counts against Cangiano, Isola and Palumbo. Cangiano was sentenced to three years imprisonment on each of the two counts and a $10,000 fine. Each of the sentences was to run concurrently, but was to be consecutive to a five-year term previously imposed for a similar offense. The fine imposed here was also in addition to a $30,000 fine levied in the prior case (*Cangiano* I).[1] Isola was sentenced to three years on each count, sentences to run concurrently. Palumbo received suspended sentences on both counts and was placed on probation for three years. These appeals by Cangiano and Isola ensued.

## I. SPEEDY DISPOSITION

Appellants Isola and Cangiano, on the appeal, urge that they were not given speedy trials in accordance with the Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (28 U.S.C. App. (Supp.1973)).[2] The appellants were arrested on November 12, 1969, indicted on June 30, 1971 and arraigned on July 22, 1971, but the Government's notice of readiness was not filed until September 28, 1971 (twenty-two months after arrest), and the trial was not commenced until October 18, 1972. Although this case began before the promulgation and effective date of our Rules (Jan. 5, 1971 and July 5, 1971 re-

1. The prior conviction in *Cangiano* I was affirmed by a panel of this Court. United States v. Cangiano, 2 Cir., 464 F.2d 320 (1972). The Supreme Court vacated the judgment and remanded for further consideration in light of its recent opinions on obscenity. 413 U.S. 913, 93 S.Ct. 3047, 37 L. Ed.2d 1023 (1973). On reconsideration the panel adhered to its earlier affirmance. 491 F.2d 905, 2 Cir., (1973) (*per curiam*).

2. These Rules have been superseded by prompt disposition plans promulgated by the various district courts within this Circuit, and approved by the Judicial Council. These plans became effective April 1, 1973.

spectively), the appellants argue that the permissible time period within which the Government must have been ready for trial was six months from the date of arrest. Rule 4; United States v. Scafo, 480 F.2d 1312, 1316–1317 (2d Cir.), cert. denied, 414 U.S. 1012, 94 S. Ct. 378, 38 L.Ed:2d 250 (1973).

■ Before we can sensibly talk about the possible expiration of the six-month period, initial reference must be made to the periods excluded by Rule 5. United States v. Lasker, 481 F.2d 229, 233 (2d Cir. 1973). Rule 5(a) excludes "[t]he period of delay while proceedings concerning the defendant are pending, including but not limited to . . . pretrial motions . . . trial of other charges, and the period during which such matters are sub judice." The Government is not required to make any motion before the six-month period has elapsed in order to take advantage of this provision. Cf. United States v. Rollins, 475 F.2d 1108 (2d Cir. 1973).

Cangiano was arrested on February 6, 1969, on similar charges involving the sale of obscene material and the indictment in that case (*Cangiano* I) was filed on April 30, 1969. The trial there did not begin until October 18, 1971, which was three weeks after the notice of readiness was filed in the present case. Thus, since *Cangiano* I was pending during the entire period from the arrest of Cangiano here, on November 12, 1969, to the filing of the notice of readiness, on September 28, 1971, the period is excluded under Rule 5(a), and, as to Cangiano, there was no violation of the six-month rule.[3]

With respect to Isola, Rule 5(e) provides that we exclude from the six-month period "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and there is good cause for not granting a severance." Since Cangiano's time for trial had not run, Rule 5(e) would again

exclude the same period and no violation of our Rules would occur providing the period of delay was reasonable and there was good cause for not granting a severance.

On May 22, 1972, when the defendants Cangiano and Isola moved to dismiss the indictment under Rule 4, no motion for a severance was made by Isola. Judge Mishler denied the motions, finding that no prejudice was established by Cangiano (Isola claimed none), and he further indicated that he had been waiting for this court to determine the appeal of *Cangiano* I, since "that decision might very well be dispositive of some of the questions in this case and maybe the entire case . . . ." United States v. Lasker, *supra*, 481 F.2d at 234, makes it clear that in a 5(e) case it is unrealistic to expect the Government to take the initiative to move for a severance. Here, Isola made no effort to obtain one, and Judge Mishler, in effect, found no unreasonable period of delay, since there was no prejudice and since the appeal in *Cangiano* I, not decided until June 26, 1972 (464 F.2d 320 (2d Cir.)), might well have disposed of the case.

■ There was here no violation of the Prompt Disposition Rules and there is no basis for dismissing the indictment, particularly since no prejudice is attributed to the delay encountered. United States v. Pierro, 478 F.2d 386, 389 (2d Cir. 1973).

## II. SPECIFIC INTENT

■ Where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute. That has been the position of this Circuit, at least since Learned Hand's opinion in United States v. Crimmins, 123 F.2d 271 (2d Cir. 1941), and the principle has been reaffirmed by this Court's recent decisions. E. g., United States v. Houle, 490 F.2d

---

3. We have reviewed the appellate briefs in *Cangiano* I (464 F.2d 320 (2d Cir. 1972)) and note that no speedy trial issue was raised.

**910**

167, 170, 172 (1973); United States v. De Marco, 488 F.2d 828, 832 (1973); United States v. Alsondo, 486 F.2d 1339, 1341 (1973); United States v. Jacobs, 475 F.2d 270, 282, cert. denied, 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 and Thaler v. U. S., 414 U.S. 821, 94 S.Ct. 131, 38 L.Ed.2d 53 (1973); United States v. Fields, 466 F.2d 119, 121 (1972); United States v. Vilhotti, 452 F.2d 1186, 1189 (1971), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335 (1972).

■ Applying the principle here, since the defendants were charged with a conspiracy to transport obscene matter in interstate commerce, the court should have instructed the jury that the defendants could be found guilty on that count only if their intent had been to transport the goods across state lines. The trial court charged on this point as follows:

> The government must prove beyond a reasonable doubt that the defendant entered into the conspiracy charged knowing that it was formed to transport obscene, lewd, lascivious and filthy material in interstate commerce and for the purpose of sale and distribution.

> The government must prove beyond a reasonable doubt that the accused knew or could reasonably foresee that the business would use interstate facilities.

> It's not necessary for the government to prove that the parties discussed interstate facilities or the distribution through interstate facilities.

> If the government, through the evidence—if you have concluded that the business of the conspiracy normally would have contemplated at least for a substantial part of its business the use of interstate facilities, then the element is satisfied.

■ Counsel for both appellants objected to the inclusion of the language that the defendants either "knew or could reasonably foresee" that the goods were to be transported in interstate commerce. Where a crime requires a general intent or where a plaintiff seeks to recover damages in tort, the principle that a person intends the reasonable and probable consequences of his actions has validity. We agree, however, that where a specific intent is required, as in an attempt or conspiracy count, the proper charge requires that the element of actual knowledge be found by the jury. See United States v. Falcone, 109 F.2d 579, 581 (2d Cir.), aff'd, 311 U.S. 205, 60 S.Ct. 1075, 84 L.Ed. 1393 (1940); United States v. Peoni, 100 F.2d 401, 403 (2d Cir. 1938). See also United States v. Lusterino, 450 F.2d 572, 574 n. 1 (2d Cir. 1971); United States v. Barash, 365 F.2d 395, 402–403 (2d Cir. 1966).

A departure from this rule is found in the dictum of this Court in United States v. Barone, 467 F.2d 247 (2d Cir. 1972), which involved a conviction for transmitting wagering information in interstate commerce:

> The appellants and the Government both assume, and we agree, that a conviction of conspiracy to violate 18 U.S.C. § 1084 requires a showing that the defendant knew or could reasonably foresee that interstate communication would be used in furtherance of the plan of action.

467 F.2d at 249. It is significant that in reversing the conviction of the defendant DiBuono in that case, the court further stated:

> In the present case there was no showing that DiBuono *knew* that interstate telephone calls would be made.

467 F.2d at 249. (emphasis in original). Thus, although the language was overbroad and the appellant made no issue of it, but rather assumed its correctness, we consider it dicta since the court placed its reversal squarely on his actual lack of knowledge and did not at all advert to whether DiBuono could have reasonably foreseen that interstate communication would be employed.

■ While the charge here was erroneous, it by no means follows that reversible error was committed. There is

a technical difference between defendants who know that the material they were transporting was actually going to cross state lines and those who "could reasonably foresee" that this was about to occur, but the distinction has no significance in the factual setting presented. The defendants here, if they were engaged in any conspiracy at all, had to actually know that interstate commerce was involved. The exhibits introduced on the trial included an address book taken from Cangiano's apartment, and notebooks taken from a pot in the stove of Isola's apartment. These records, which were in Isola's custody and which the jury asked to have sent into the jury room during their deliberations, not only identified the materials sold (playing cards, films, books and magazines) and the amounts paid, but also identified the customers and their addresses as well. Where actual out-of-town addresses do not appear, the primitive code employed is quite obvious. Thus, we find buyers identified as Bob Hoboken, Danny Trenton, Steve Pittsberg [sic], Dickie Boston and Charlie Springfield, to name just a few. The telephone number for each customer reveals an area code corresponding to the city of his last name. This is not a case in which the defendants would just have reason to believe that interstate transportation was foreseeable; this was the precise business they were engaged in. This is not a case in which the interstate jurisdictional basis depends upon an isolated phone call or a casual trip across state lines. An examination of the records made available to the jury discloses a huge volume of sales of pornographic materials totalling hundreds of thousands of dollars to customers identified as living in Massachusetts, Connecticut, Rhode Island, New Jersey, Pennsylvania, Maryland, Georgia, Nevada, California, Michigan and Ohio. Neither Cangiano, who was the principal figure in the conspiracy, nor Isola, who had custody of the bulk of the records of the business, could have been unaware of the destination of the obscene material. If she was

engaged at all in the business, it is incredible that she was unaware of its interstate dimensions. Cangiano was observed in her apartment on several occasions. It was a meeting place and one of several storage places for the obscene material. She was seen loading and unloading her car with cartons, not only at her home, but at 1741 Victory Boulevard, which was also utilized as a headquarters for the group. Cangiano was observed carrying cartons to and from her apartment. Isola was further seen transporting cartons from 307 Gordon Avenue, the principal warehouse used by the group, to Victory Boulevard, where she in turn picked up other packages and brought them back to her apartment.

The evidence of Isola's active involvement is indeed overwhelming and in fact no claim of insufficiency is made on appeal. In view of her obvious familiarity with the business and the identity of its clientele, we cannot characterize the court's charge on intent to be reversible error. See Stone v. United States, 435 F.2d 1402, 1406 (2d Cir. 1970); United States v. Corallo, 413 F.2d 1306, 1326–1327 (2d Cir. 1969).

## III. THE SEARCH WARRANTS

Appellants argue that the search warrants, pursuant to which obscene matter was seized at 769 Forest Avenue (Isola's apartment), 307 Gordon Street (a storage facility not occupied by any of the defendants) and 1741 Victory Boulevard (presumably the office of the Helena Pillow Company), were invalid. Having been advised by a reliable informant that Cangiano had moved part of his pornography operation from Brooklyn (see *Cangiano* I, 464 F.2d 320 (2d Cir. 1972)) to Staten Island, FBI agents commenced a four-month surveillance which included the three named locations. The informant further notified the FBI that Cangiano was storing large quantities of pornographic materials in the Forest Avenue apartment and in cars parked in the vicinity, including one registered in Isola's name, as well as

his own. Another informant advised that Cangiano was similarly using a basement at Gordon Street for storage of the pornographic material. The Victory Boulevard location was described as the sales office of the business. One of the informants gave the agents four film reels, one deck of playing cards and six magazines called "Wife Swapping," all of which were obtained from Cangiano and all of which described or depicted men and women engaged in natural and unnatural sex acts.

On November 11, 1969, a sales transaction was observed at the Victory Boulevard address involving a man (Miele), who was driving a car with an out-of-state license. He was followed by agents into New Jersey where he was arrested and his car searched. It was found to contain a carton of 100 eight mm. "stag films" which Miele admitted he had purchased from Cangiano. One was then screened for a United States Commissioner, and the agent in charge of the investigation further provided him, in affidavit form, with the information received from the informants, as well as the results of the surveillance.

Warrants were issued on November 12th to search the three locations described on Forest Avenue, Gordon Street and Victory Boulevard. The three warrants directed the agents to seize:

> a quantity of playing cards, films, and magazines and books, depicting obscene and lascivious pictures, constituting hard core pornographic material, which pictures portray men and women in the natural and unnatural sexual acts and which playing cards, films, magazines and books are being used to conduct a business of transporting, selling and distributing obscene, lewd and hard core pornographic pictures in interstate commerce which are in violation of Title 18, United States Code, Section 1465 and 2.

On that day, the search of Forest Avenue and Gordon Street yielded vast quantities of pornographic materials, as well as the business records of the defendants. Isola's car was searched pursuant to a New York City warrant and yielded four hundred reels of pornographic films. All of the obscene material was admitted into evidence and seven films were screened for the jury.

Judge Mishler ruled below that neither Cangiano nor Isola had standing to contest the seizure at Gordon Street since neither had a possessory interest in the premises. Cangiano's claim that he was the "target of the search" and thus had standing is of doubtful validity. United States v. Mapp, 476 F.2d 67, 71 (2d Cir. 1973). However, we need not rule on the question since we find no taint in the searches. It is conceded, moreover, that Isola has standing to contest the search of her Forest Avenue apartment.

■ ■ The appellants urge that the application for the search warrants was defective since it failed to establish the interstate nature of the crimes charged, and therefore failed to establish a federal crime. The proper standard to be employed, of course, is whether or not the Commissioner had "probable cause" to issue a warrant on the basis of the affidavit submitted in its support. Jones v. United States, 362 U.S. 257, 267, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960). Here there was sufficient reason alleged to support a probable cause to believe that interstate commerce was involved. A reliable informant indicated that Cangiano, who had been previously indicted for the interstate transportation of obscene material, had moved his business to Staten Island; the Miele arrest in New Jersey and his admission of the purchase of "stag films" from Cangiano, were recited in the affidavit; the loading of a U-haul van with Indiana plates at Victory Boulevard and Gordon Street, was also recited. These facts provided probable cause to suspect that a federal crime was in progress.

■ Appellants further urge that since "massive" seizures were involved, the defendants were entitled to a prior

adversary hearing. The cases relied upon by the appellants are not at all in point. While the seizures may well be described as "massive", there is no semblance here of any violation of First Amendment rights which was apparent in such cases as A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), and Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), in which there were massive seizures of books from commercial bookstores for the purpose of destroying the books as contraband, or Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968) (*per curiam*), in which there was a seizure of film from a commercial theatre regularly open to the public without any prior judicial scrutiny. As Chief Justice Burger observed in Roaden v. Kentucky, 413 U.S. 496, 500, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973):

> The common thread of *Marcus, Quantity of Books*, and *Lee Art Theatre* is to be found in the nature of the materials seized and the setting in which they were taken. . . . In each case the material seized fell arguably within First Amendment protection, and the taking brought to an abrupt halt an orderly and presumptively legitimate distribution or exhibition. Seizing a film, then being exhibited to the general public, presents essentially the same restraint on expression as the seizure of all the books in a bookstore. Such precipitous action by a police officer, without the authority of a constitutionally sufficient warrant, is plainly a form of prior restraint and is, in those circumstances, unreasonable under Fourth Amendment standards. The seizure is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness. The setting of the bookstore or the commercial theatre,

each presumptively under the protection of the First Amendment, invokes such Fourth Amendment warrant requirements because we examine what is "unreasonable" in the light of the values of freedom of expression.

■ The defendants here were not operating either a bookstore or a motion picture theatre with the public invited to purchase material or to view screenings. This was strictly an underground operation in hard core pornography with clandestine storage facilities not intended to be available to the public, but only to its trusted customers. The "setting" then is hardly such as to presumptively invoke First Amendment protection. Moreover, the fact is that there was one complete screening of a film for the Commissioner. To require that samples of all the films be screened finds no support in precedent or logic. The defendants were dealing commercially in large scale fungible smut. On the basis of the screening plus the affidavit reciting the information made available, as well as the surveillance, the officers were directed to seize specifically "playing cards, films, and magazines and books" which portrayed "men and women in the natural and unnatural sexual acts." The language was not conclusory nor did it simply track the language of the statute. Rather, it followed *in haec verba* the language suggested by Judge Smith as appropriate in United States v. Marti, 421 F.2d 1263, 1268 (2d Cir. 1970), cert. denied, 404 U.S. 947, 92 S.Ct. 287, 30 L. Ed.2d 264 (1971).

While appellants now suggest a "prior adversary" hearing as a constitutional requisite, they in fact never sought pretrial return of the materials, nor did they urge that the seizures prevented exhibition to the public by use of other copies. See Heller v. New York, 413 U. S. 483, 484, 93 S.Ct. 2789, 2791–2792, 37 L.Ed.2d 745 (1973). On trial the defendants were willing to stipulate that the materials seized were obscene. Moreover, as emphasized in Heller v. New York, *supra*, 413 U.S. at 491, 93 S. Ct. at 2794 n. 7 & 2795 (1973), the sei-

zures here were not made for the purpose of destruction nor for the purpose of blocking the public from viewing commercial films or reading or purchasing books openly displayed, but rather to preserve evidence for a criminal prosecution. See also *Cangiano* I, 464 F.2d 320, 327–329 (2d Cir. 1972).

In sum, we find that the warrants here were issued on reasonable cause to believe that a federal crime was committed, and that the seizure of the materials thereunder violated no First or Fourth Amendment rights.

### IV. COMMUNITY STANDARDS

■ It is urged that the charge was erroneous in failing to adequately define the "community" by whose standards the obscene nature of the materials was to be determined, and that this error requires reversal. Judge Mishler instructed the jury with respect to community standards in substantially the same language he had employed in *Cangiano* I. That case was remanded to this court for further consideration following the Supreme Court's recent opinions on obscenity (see note 1, *supra*), and on remand, that portion of the charge was challenged on essentially the same ground urged here. See Brief for Dominick Ariale at 5. The panel, on considering all of the arguments raised on remand, adhered to its earlier affirmance. 491 F.2d 905, 2 Cir., (1973) (*per curiam*). Moreover, the obscene nature of the materials involved here has never been contested below or on appeal. Our own review of the evidence discloses that it is so patently offensive that it would be obscene in any community including its zoological gardens.

Having considered all of appellants' arguments, we affirm the convictions below.

OAKES, Circuit Judge (dissenting):

I dissent.

I agree with Parts I, II and III of the majority opinion in this case. I disagree, however, with Part IV relating to "community standards."

Chief Judge Mishler's instructions to the jury failed to define by what community standards the alleged obscenity in this case was to be judged—regional, statewide, districtwide, citywide, boroughwide or neighborhoodwide—and all of these alternatives are open. Rather, the instructions referred to the "community as a whole"—what community he did not say. At the time of trial most people thought, and objection to the charge was made on this basis, that the national community established the controlling standard. *See* Jacobellis v. Ohio, 378 U.S. 184, 193, 84 S.Ct. 1676, 12 L.Ed. 793 (1964). The Supreme Court has now made it tolerably clear that, indeed, the test of obscenity is to be determined by the standards of the community of the triers-of-fact, Miller v. California, 413 U.S. 15, 30–34, 93 S. Ct. 2607, 37 L.Ed.2d 419 (1973), so that Chief Judge Mishler cannot be faulted in this respect; indeed, he may have anticipated the *Miller* case by refusing to charge national standards. The Supreme Court has not yet told us, however, what is meant by the community of the triers-of-fact or if this is some objective test relating to the views of others in their community or some subjective test relating to their state of mind.

Regardless of our being left somewhat in the dark by the Supreme Court, regardless of what we appellate judges may think of the nature of the materials [1] the transportation of which

---

1. Some of us may think of that nature as dangerous, even to adults, some as debasing or corruptive, some as ludicrous. In the light of what Professor Emerson has called "a serious lack of evidence as to what the effects of obscenity, if any, actually are,"

The System of Freedom of Expression 467, 498 (1969), to some of us it may appear pathetic that the mores of Queen Victoria prevailed for so long that people today actually pay good money to examine the schlock the appellants were convicted of transporting or

in interstate commerce is charged as illegal—and for this purpose one may assume indeed in Judge Mulligan's typically amusing phrase that even a community's "zoological gardens" would treat the material here in question to be "obscene, lewd, lascivious and filthy" under the words of the statutes—a defendant is entitled to a determination of guilt or innocence by a jury under proper instructions by the court. United States v. Fields, 466 F.2d 119 (2d Cir. 1972). *See also* Bollenbach v. United States, 326 U.S. 607, 613–614, 66 S.Ct. 402, 90 L.Ed. 350 (1946); Screws v. United States, 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Clark, 475 F.2d 240, 248–251 (2d Cir. 1973). This, indeed, is what a jury trial is all about. Even contemptible purveyors of "hardcore" pornography are entitled to proper instructions by the court when being tried for a criminal offense by a jury. Moreover, tomorrow it may be someone else who is being tried for the same offense. And that someone may be a theater (or a bookstore), a producer or director, even an artist.

We are in an area where freedom of expression and its converse, freedom of consumption of thought or what I would call freedom of reception, is ultimately involved. It is unfortunate that principles sometimes have to be established in cases involving those who would abuse these or other basic freedoms including those who would purvey so-called hardcore pornography to a willing, if—at least among the denizens of the older generation—an overly prurient, public. But we must be very careful lest the principles established in cases such as this one be permitted to make substantial encroachment upon freedom of expression or, as I say, its converse, freedom of reception. Only the other day the Supreme Court granted certiorari in Jenkins v. Georgia, 414 U.S. 1090, 94 S. Ct. 719, 38 L.Ed.2d 547 (1973), where a local community—in that case, a town—determined the movie "Carnal Knowledge" to be obscene. There is here so much at stake that it seems to me we must be very careful and very precise, now that a majority of the Supreme Court has taken the position that non-national standards may govern, to require definition of just what local standards the law is referring to, lest tomorrow an Ingmar Bergman, a Stanley Kubrick or a Francois Truffaut be considered, by judicial fiat, to have produced something which according to a group of appellate judges even the residents of the "zoological gardens" [2] would find obscene.

I would reverse and remand for a new trial with instructions to the jury to be framed under whatever law the Higher Court has at the time of retrial last established.

---

conspiring to transport. As in prohibition, however, an artificial market for such trash has been created. One would hope that another generation—less imbued with the fantasies symbiotically related to the suppression of the past—will be less ready to buy this shoddy stuff. One must be careful, too, when one makes judgments in this area to remember that "the hard-core pornography test, like the *Roth* test, [is] a way of allowing high-class, elegantly packaged pornography, while denying pornography to the less affluent, educated or supposedly intelligent." *See* Emerson, *supra* at 492.

2. One cannot help but note, in passing, that in a true state of nature—zoological or otherwise—obscenity would not exist; it *is*, as the philosopher Berkeley would have said, only because it is perceived in the eye of the viewer.