**UNITED STATES of America,
Appellee,**

v.

**Luis MARTI and Lou Saks, Appellants.**

**Nos. 237–238, Dockets 33472, 33473.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 6, 1969.

Decided Feb. 3, 1970.

1264

Raymond Bergan, Washington, D. C. (Edward Bennett Williams, Patrick M. Wall, Washington, D. C., on the brief), for appellant Marti.

Gustave Newman, Brooklyn, N. Y. (Evseroff, Newman & Sonenshine, Brooklyn, N. Y.), for appellant Saks.

James T. B. Tripp, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., Southern District of New York, John E. Sprizzo, Asst. U. S. Atty, on the brief), for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Appellant Marti was indicted along with nine other defendants on two counts of conspiracy to transport obscene materials in interstate commerce for the purpose of sale and distribution, in violation of 18 U.S.C. § 1465 (1966): (1) for transporting obscene still photographs, and (2) for transporting obscene films. Appellant Saks was indicted on the second count alone. Appellants were tried together before a jury in the United States District Court for the Southern District of New York (the other defendants either became fugitives, pleaded guilty, or received separate trials) and were found guilty on all counts. On March 4, 1969, Judge Tenney sentenced them to two years imprisonment on each count, Marti's sentence to run concurrently. Appellants attack their convictions on several grounds. We hold that the convictions must be reversed since they were obtained through the admission into evidence of materials seized pursuant to unconstitutionally general search warrants.

The relevant facts are quite simple and the sufficiency of the evidence is not in dispute. In early 1966 appellants Marti and Saks both had obscene color films processed by co-defendant Gentile and the transactions were carried out through an intermediary, co-defendant Pelletier. The films depicted various nude males and females engaged in na-

tural and unnatural sexual acts; the obscenity of the films and still photographs is conceded. When Gentile could no longer process films in mid-1966 due to the closing of the laboratories he used, alternate arrangements were made and still photographs were processed by co-defendant Stewart Laboratories. Both Pelletier and Gentile served as intermediaries in these transactions between Marti and the co-defendant agents of Stewart Laboratories. Marketing of the films and photographs was carried out by appellants personally and by co-defendants Goldman and the Delmars (a husband-and-wife team). The interstate nature of the scheme was evidenced by substantial sales in New York during 1965 and 1966 to one Brauer of Baltimore, Maryland, who resold the materials in Maryland at a handsome profit.

## I.

Appellants first contend that they were deprived of their rights of confrontation of witnesses and due process under the Sixth and Fifth Amendments when the court below prevented defense counsel from cross-examining a principal government witness, Pelletier, as to his residence. When asked on cross-examination where he lived, Pelletier gave the nonspecific answer, "In Queens." When defense counsel asked him where in Queens he lived, the prosecutor asked for a side bar conference and the following colloquy occurred:

"Mr. Adams: Your Honor, I would request that the address of this witness not be disclosed. I would be happy to furnish to counsel the address if they have any particular purpose, but I do not wish the defendants in this case to know where Mr. Pelletier is living.

The Court: I assume that is agreeable to both counsel.

Mr. Evseroff: I would like to state for the record that I think it is highly improper. * * *

The Court: Well, if in any way, if I permit the question to be answered,

I receive any word of any communication being made, I will hold you gentlemen [defense attorneys] responsible.

Mr. Bobick: I don't know how you can hold us responsible.

Mr. Evseroff: Judge—

The Court: That is all."

The cross-examination then continued and Pelletier never testified as to his address. Defense counsel never sought private communication of Pelletier's address from the prosecutor pursuant to his apparent offer in the colloquy.

At the outset, the government argues that the court here did not prevent the defense from asking Pelletier his address since it conditionally allowed the question to be answered if counsel would be responsible for "any communication." It would appear, however, that the court was warning defense counsel that if Pelletier testified as to his address, counsel would be held responsible if Pelletier were harassed as a result of his revealing his address in open court. Since counsel could not insure that Pelletier or his family would not be harassed, it was perhaps not unreasonable for them to view as too costly the court's condition on allowing Pelletier to answer.

We must therefore consider whether appellants' constitutional rights were infringed by the trial court's action which prevented counsel from eliciting Pelletier's address on cross-examination. Appellants rely on Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), and Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). In *Smith*, a prosecution witness testified under a false name and the defense was prevented from eliciting the true name and address on cross-examination. The Supreme Court overturned the conviction on the ground that the name and address of a witness are necessary for in-and-out-of-court investigation of the witness. In *Alford*, the defense was prevented from obtaining the address of a prosecution witness on cross-examination; the Court reversed

the conviction on the ground that asking the address of a witness is proper even if only for exploratory purposes or to put the witness into his proper environment. In *Alford* itself, however, there was reason for the defense counsel to believe that the witness was presently in custody, a fact which, if revealed in open court, would have had great impact on the jury's evaluation of the witness' testimony.

There are two central interests which are strongly safeguarded by *Smith* and *Alford*, neither of which seem to be involved in the instant case. First, the defense needs testimony as to a witness' address on cross-examination so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination. However, in the present case the prosecution offered to communicate Pelletier's address privately to defense counsel, so that the defense cannot claim that it was prejudiced by being unable to obtain Pelletier's address. In *Smith*, although defense counsel knew the witness from previous experience, there was no indication that counsel knew the witness' true name or address. See United States v. Garafolo, 385 F.2d 200 (7 Cir. 1967), vacated, 390 U.S. 144, 88 S.Ct. 841, 19 L.Ed.2d 970 (1968), rev'd on remand, 396 F.2d 952 (7 Cir. 1968). Here, the inability to elicit Pelletier's address on cross-examination cannot have prejudiced any investigation of Pelletier, either in or out of court. Cf. United States v. Bennett, 409 F.2d 888 (2d Cir. 1969). No claim is made here that any investigation of Pelletier would have been somehow less thorough if only counsel knew his address (as the prosecutor offered) then it would have been if both counsel and appellants knew it (as they would have if Pelletier gave his address in open court). In fact, in view of counsel's failure to ask the prosecutor for the address privately, it is unlikely the defense was interested in the address for investigative purposes.

Second, the defense may need the witness to reveal his address in court because knowledge of the address by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability. Thus, in *Alford, supra*, the possible revelation in open court that the witness was residing in jail would have been pertinent to the evaluation of his credibility and to the question of whether the witness had been promised anything for his testimony. No such concern that the jury needed to know Pelletier's address is present in this case. Indeed, the type of residence, the part of town it was in, and the monthly rent were revealed on cross-examination. Therefore, the jury's knowledge of the specific street address would add nothing to its deliberations on Pelletier's testimony.

■ We agree that the government should come forward with its reason for wanting to prevent the revelation in open court of the witness' address, see *Smith, supra*, 390 U.S. at 134, 88 S.Ct. 748 (Mr. Justice White, concurring); the reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness. See *Alford, supra*, 282 U.S. at 694, 51 S.Ct. 218. But the failure of the prosecutor in this case to come forward with his reason is not enough to warrant reversal, especially in the light of defense counsel's apparent disinterest in knowing the address. Although counsel strongly objected to the court's ruling, they never challenged the prosecutor's motives nor accepted his offer of private communication. Therefore, no constitutional rights of appellants were infringed by this restriction on Pelletier's cross-examination.

II.

Appellants next attack their convictions on the ground that evidence was obtained pursuant to search warrants which were too general. The three warrants in question were issued by Judge Basel of the New York City Criminal Court on September 29, 1967 upon the

affidavit of New York Detective Romandetta. They directed any New York City peace officer to search a blue Chevrolet Saks had been seen driving, and two premises, 31–07 and 31–13 21st Street in Queens County, as well as the person of Saks and anyone else in possession of the above properties. They also directed the seizure of any property "being used and/or possessed in violation of Section 235.05 subd. 1 (Obscenity) of the New York State Penal Law [McKinney's Consol.Laws, c. 40]." [1] This general direction on its face left to the executing officers the task of deciding which property was obscene in violation of the state obscenity law and thus subject to seizure. The affidavit supporting the warrant, on the other hand, was quite specific, and was accompanied by four reels of film allegedly purchased from Saks by an informant, four film scraps allegedly recovered from the garbage outside of 31–07 21st Street, and several still enlargements from the film scraps. The affidadavit described the contents of the films and scraps as depicting males and females engaged in the acts of oral sodomy, sexual intercourse and masturbation. Although Judge Basel did not view the reels of film, he did view the still enlargements and read the descriptions of the film contents before issuing the warrants; there is no challenge to the sufficiency of the affidavit or probable cause to issue the warrants.

On the same day, September 29, 1969, Detective Romandetta and three other officers executed the warrants. They searched the two buildings, Saks' person, and the car which had been parked outside of 31–07 21st Street. Before seizing any films, Detective Romandetta viewed each with a handviewer and decided to seize a film only if it depicted persons engaged in natural or unnatural sexual acts. Thus, Romandetta, in executing the warrants, in fact seized only films which were obscene by any standard. In the building at 31–07 21st Street the officers found and seized 8 reels of such films. The officers also seized several truckloads of photographic equipment and processing chemical, as well as several reels of unexposed movie film. Saks was on the premises, was searched and arrested, and film lists, film scraps, and the car keys were recovered from his person. The premises of 31–13 21st Street were searched, but the only films found there were "girlie" films or ordinary cartoon films and so nothing was seized in that building. The car was also searched and 31 reels of film were found in the trunk. After viewing each of these and finding that they depicted various sexual acts, Detective Romandetta seized them. The seized films were admitted into evidence over appellants' objections.

1. The texts of the three warrants were essentially the same; only the places to be searched varied. The full text of one warrant is as follows:

SEARCH WARRANT
(U. S. v. Lou Saks)
Criminal Court of the City of New York
Part 1A—County of New York
In the name of the People of the State of New York:
To any peace officer in the City of New York:
Proof by affidavit (or deposition) having been made this day before me by Detective Vincent Romandetta, Shield #2932, First Deputy Commissioner's Office, that there is a probable cause for believing that certain property is being used and/or possessed in violation of Section 235.05 subd. 1 (Obscenity) of the New York State Penal Law.

You are therefore commanded, between the hours of 6:00 A.M. and 9:00 P.M. to make an immediate search of premised 31–07 21st Street, County of Queens, City and State of New York, a one story taxpayer.
and of the person of Lou Saks and of any other person who may be found to have such property in his possession or under his control or to whom such property may have been delivered, for purposes of violation of Section 235.05 subd. 1 of the New York State Penal Law.
and if you find any such property or any part thereof to bring it before me at Part 2A at 100 Centre Street, New York City, County of New York.
Dated at New York City,
September 29, 1967
. . . . . . . . . . . . . . . . . .
Judge

■ The warrants here essentially directed the executing officers to seize any materials found by them to be in violation of the New York obscenity laws. The warrants themselves gave no guidelines to the officers as to what is obscene and what is not. Thus, the warrants on their face left ,to the executing officials the discretion of deciding what materials were obscene. Such warrants would seem to be deficient for failing to describe with particularity the items to be seized as required by the Fourth Amendment. Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L. Ed.2d 1127 (1961); People v. Rothenberg, 20 N.Y.2d 35, 281 N.Y.S.2d 316, 228 N.E.2d 379 (1969); see Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L. Ed.2d 431 (1965); Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 1016 (1927). The danger underlying such general warrants is that the person searched is at the mercy of the executing official. While some discretion must be given executing officials to interpret the words of every warrant no matter how particularly the items to be seized are described, an unduly large amount was given here. The warrants could well have commanded, for example, the seizure of films "depicting natural or unnatural sexual acts" instead of giving the instant broad conclusory command, and this would have restricted significantly the discretion of the executing officials. The dangers of this generality are particularly acute in areas touched by the First Amendment such as obscenity, since any erroneous exercise of the broad discretion granted officials would result in the seizure of materials protected by the First Amendment. See Marcus, supra, 367 U.S. at 731, 81 S.Ct. 1708, Stanford, supra, 379 U.S. at 486, 85 S.Ct. 506.

■ The government contends that the generality of the warrant is cured by the specificity of the affidavit which supports it. Compare, People v. Hendricks, 45 Misc.2d 7, 256 N.Y.S.2d 78 (Sup.Ct., Queens County, 1965), rev'd on other grounds, 25 N.Y.2d 129, 303 N.Y. S.2d 33, 250 N.E.2d 323 (1969), to People v. Coletti, 39 Misc.2d 580, 241 N.Y. S.2d 454 (Westchester County Ct., 1963). In the present case the affidavit made clear why the affiant Romandetta believed there was a violation of obscenity laws—he had seen films depicting various sexual acts. Moreover, the government contends that since Romandetta submitted the affidavit, he was aware of the elements of obscenity which went into the issuance of ,the warrants, and hence he was impliedly restricted when executing the warrants by the specificity of his own affidavit. Finally, the government contends that even if Romandetta were not restricted by his affidavit, he viewed each film before seizing it and in fact seized only those obscene films which were contemplated by the affidavit and the warrants issued thereupon. \

It is true that in Marcus and Rothenberg, supra, the affidavits supporting the warrants contained the same general conclusory language as did the warrants. So in those cases there was the additional danger, not present here, of having warrants issue on conclusory allegations of obscenity by police without any meaningful judicial determination prior to seizure of the probable obscenity of the materials. Cf. Berger v. New York, 388 U.S. 41, 99, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (Mr. Justice Harlan, dissenting). But specificity is required in the warrant in addition to ,the affidavit in order to limit the discretion of executing officials, see Marron v. United States, supra, 275 U.S. at 196, 48 S.Ct. at 76. ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."), and to give notice to the person subject to the search what the officers are entitled to seize, see Hendricks, supra, 45 Misc. at 10, 256 N.Y.S.2d at 81. But see People v. Sanchez, 53 Misc.2d 672, 279 N.Y.S.2d 836 (Crim.Ct. County of N.Y.1967) (specific affidavit held to cure general warrant when warrant expressly refers to the affidavit for the particular description). Appellants' First Amendment

rights cannot be adequately safeguarded by the recollection of the executing official of the specifics of his affidavit and his good faith in remaining within the restrictive confines implied by the affidavit. The fact that Detective Romandetta in executing these warrants did an admirable job of looking for the specifics set out in the affidavit before seizing any materials, does not erase the fact that appellants were subject under these warrants to a greater exercise of power by Detective Romandetta or any other peace officer who could have executed the warrants. The warrants and seizures here must fail despite the manner of the warrants' execution. See *Marron, supra;* People v. Rainey, 14 N.Y.2d 35, 248 N.Y. S.2d 33, 197 N.E.2d 527 (1964). The inconveniences of copying the specific elements from the affidavit into the warrants is small, and the dangers inherent on the failure to do so are great.[2] We therefore, conclude that the warrants were general and that this defect was not cured by the specificity of the supporting affidavit, the identity of the affiant and the executing officer, or the care of the executing officers in seizing only those films described in the affidavit.

The government contends that even if the warrants were defective due to their failure to describe with particularity the items to be seized, the seizures were nevertheless valid as incident to Saks' lawful arrest. Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 1016 (1927); People v. Matherson, 16 N.Y.2d 509, 260 N.Y.S.2d 448, 208 N.E.2d 180 (1965); cf. United States v. Ventresca, 380 U.S. 102, 108–

109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (overly strict review of warrants and affidavits will have the undesirable effect of encouraging officers to act without warrants). Even assuming that upon the record before us we could find that the officers had probable cause to arrest Saks had they not already had the benefit of the search pursuant to the defective warrants (no arrest warrant was issued against Saks), the contention is without merit because some of the seizures were not incident to the arrest. Were this seizure subject to the rule announced in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), most of the items seized would have to be suppressed since they were found either out of Saks' reach, in another room of the same building in which Saks was arrested, or in the trunk of his car outside of the building. But we have held that *Chimel* should be applied only prospectively. United States v. Bennett, 415 F.2d 1113 (2d Cir. 1969); compare, Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed. 2d 728 (1969) (Mr. Justice Harlan, concurring in the result, intimating that he would apply *Chimel* to all cases still on direct review at the time of decision). Therefore, whether the seizures were justified as incident to a lawful arrest must be determined on the basis of pre-*Chimel* law. The seizure of films and equipment within the premises in which Saks was arrested (31–07 21st Street) would seem to be permissible under the directly applicable authority of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). See United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The

---

2. No claim is made by the government here that Marti's conviction should be affirmed even if the searches and seizure of Saks' car violated Saks' constitutional rights, on the ground that Marti might not have standing to assert a violation of Saks' rights. See Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); cf. Katz v. United States, 389 U.S. 347, 352, 88 S.Ct. 507, 19 L.Ed.2d

576 (1967). The government apparently avoided such an argument since asserting it might require separate trials of the two appellants if the seized evidence was admissible only against one of them. United States v. Kelly, 349 F.2d 720 (2d Cir. 1965); see Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We therefore need not consider whether appellant Marti lacked the requisite standing to assert the Fourth Amendment claim.

building in which Saks was arrested seems to be roughly the same size as that in *Harris*.

Although a search warrant was issued for a second building, 31–13 21st Street, several doors away, and a search was conducted, nothing was seized from this building, apparently because the films found there were either cartoon or "girlie" films and hence not obscene. Had there been a seizure and had this evidence been admitted, it could not have been justified even under pre-*Chimel* standards since seizures in a separate building cannot be incident to an arrest.

[6] The question remains whether the seizures of films, etc., from the trunk of Saks' car, can be justified as incident to Saks' arrest. The car had been parked by Saks "in front of the location 31–07 21st Street." This case is not controlled by those cases allowing searches of cars when the arrest occurred while the suspect was in the car. United States v. Gorman, 355 F.2d 151 (2d Cir. 1965), cert. denied, 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966); Price v. United States, 121 U.S.App.D.C. 62, 348 F.2d 68 (1965); compare, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). In those cases which uphold the search, the search was proper since at the time of the arrest the suspect was in control of the car. Here, Saks was inside the building when he was arrested. Nor is this case controlled by United States v. Baratta, 397 F.2d 215 (2d Cir.), cert. denied, 393 U.S. 939, 89 S.Ct. 293, 21 L.Ed.2d 276 (1968), and United States v. Francolino, 367 F.2d 1013 (2d Cir. 1966). In those cases, the arrests occurred in appellants' homes and the cars were parked outside the homes in the driveways. We held that it would make little sense to draw distinctions between cars in driveways, cars in garages on premises but not attached to the home, and cars in garages which were built into the home (the latter presumably could be searched under *Rabinowitz* and *Harris*). The difference between those cases and the instant one is that in those cases the car was on the premises of the appellant, whereas here it was on the public street. While it may make little sense to differentiate between proximate loci on appellant's own property, we find nothing in pre-*Chimel* cases which would permit as incident to an arrest inside of a building, the search of a car outside the building on the public street. Our conclusion is buttressed by the Supreme Court's *per curiam* opinion in Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732 (1969) which was purportedly decided on pre-*Chimel* standards. In that case, petitioner was arrested outside of his home as he alighted from a car parked 15 or 20 feet from the house. The Court found that a search of the house could not be justified as incident to his arrest. Since the Supreme Court seems to be narrowing the pre-*Chimel* standards, see *Von Cleef* and *Shipley, supra*, we should not expand the area of search incident to an arrest to cover a car parked on the street outside of the premises where arrest occurred.

■ Since the search and seizures of the car were not incident to arrest, and since the warrant was defective, the government seeks to avoid upsetting the convictions on the ground that the search of the car could be carried out without a warrant since the car could have been seized and then searched preliminary to a forfeiture proceeding against the car for its use in transporting obscene materials. United States v. Francolino, 367 F.2d 1013 (2d Cir. 1966) (alternative holding); see Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); N.Y.Penal Law § 410.00 (McKinney 1967). Without questioning the validity of *Francolino* as to warrantless seizures and searches of cars carrying contraband (to wit: forged checks), to permit warrantless seizures and derivative searches of automobiles believed by police to be transporting obscene materials would involve the same First Amendment hazards which motivated the Court in Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct.

1708, 6 L.Ed.2d 1127 (1961). A warrantless seizure of an automobile could be conducted by police officers without a prior ruling by a judicial official on whether the allegedly obscene materials carried in the car were probably obscene. Thus, the danger of bias of enforcement officials would be unchecked by a prior objective judgment of a judicial official. Moreover, officers would have free reign to decide which materials were obscene and hence subject to seizure prior to forfeiture proceedings. The Court in *Marcus* expressly distinguished between the permissible discretion of officials to seize contraband such as "gambling implements"or "all intoxicating liquors" and the discretion to seize "obscene * * * publications." 367 U.S. at 731, 81 S.Ct. 1708. It is undoubtedly a simpler task for a law enforcement official to recognize contraband such as gambling equipment or forged checks than it is for him to determine which materials are obscene. See Speiser v. Randall, 357 U.S. 513, 525, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958) (" * * * the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn. The separation of legitimate from illegitimate speech calls for more sensitive tools * * *.") Moreover, the dangers of an official mistake are far greater in the area of obscenity since it results in the removal from circulation of nonobscene materials which are protected by the First Amendment. We therefore hold that the narrow exception to the requirement of a warrant for searches and seizures not incident to an arrest laid down in *Francolino* and *Carroll* does not comprehend warrantless seizures of automobiles on the ground that they are allegedly carrying obscene materials. Compare, Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969), with United States v. Wild, 422 F.2d 34 (October 29, 1969).

Since the seizure of evidence from Saks' car cannot be justified, the admission of this evidence at the trial was error requiring reversal.[3]

### III.

Finally, appellant Saks appeals his conviction on the ground that the trial court should have granted his pre-trial motion for severance.[4] Saks sought alternatively to sever the trial of Marti on count one (as to still photos) permitting joint trial on count two alone (as to films), or to sever his own trial entirely from that of Marti. We hold that appellants were properly joined under Rule 8 (b) of the Federal Rules of Criminal Procedure and that the trial judge did not abuse his discretion on denying Saks' motion for partial or total severance. See Federal Rules of Criminal Procedure, Rule 14.

Saks claims that the introduction of numerous government exhibits containing obscene still photographs to prove Marti's guilt under count one prejudiced his own attempt to establish innocence of the charges as to films under count two. He contends that the trial judge's warnings during the trial and in the charge that evidence as to stills should be considered in regard to count one against Marti were not sufficient to insure against the prejudice of having the jury see the still photos before deciding the question of Saks' guilt on count two.

3. Appellants attack the seizures on the broader ground that seizures in obscenity cases must be preceded by an adversary hearing as to the obscenity of the materials seized. See Bethview Amusement Corp. v. Cahn, 416 F.2d 410, 411–412 (2d Cir. 1969); 208 Cinema v. Vergari, 298 F.Supp. 1175 (2d Cir., Oct. 9, 1969) (unpublished rev'd in part and aff'd in part in open court). But see United States v. Wild, 422 F.2d 34, 37, 38 (2d Cir. 1969) [Docket Nos. 32510–32513 (2d Cir., Oct. 29, 1969)]; Milky Way Productions, Inc. v. Leary, 305 F.Supp. 288 (S.D.N.Y. Oct. 15, 1969) (3 Judge court mimeographed copy). In view of our finding that the seizures were pursuant to defective warrants, there is no occasion to consider this broader contention.

4. The motion was repeated several times during the trial.

Finally, he asserts that the prejudice was compounded by the government's attempt through testimony to show that many of the still photos were taken during the same session at which the movie films were taken. Thus, the jury allegedly was confused about the counts to which testimony and exhibits should be applied despite the trial judge's admonitions.

■ Saks' arguments seem to be premised on the hypothesis that were he given a separate trial, evidence about the still photographs would not be admissible against him on the charge dealing only with films. This hypothesis, however, is incorrect. As the government showed at trial, Marti and Saks were engaged in business together during 1966 when the still photographs were being processed. Moreover, production of the stills and moving pictures arose out of the activities of the same group of people and the products were marketed together and sold through the same intermediaries to the same customers. And there was evidence that the films and stills were taken at the same photographic sessions. Thus the evidence of the conspirators' involvement in the production of obscene still photographs would be admissible against Saks had he been tried alone on count two as to films. United States v. Lebron, 222 F.2d 531, 535 (2d Cir. 1955); see United States v. Jones, 374 F.2d 414 (2d Cir.), cert. denied, 389 U.S. 835, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967). Therefore, the problems of joinder and admission of evidence against one co-defendant which is inadmissible against the other are not present here. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); United States v. Kelly, 349 F.2d 720 (2d Cir. 1965). Moreover, in the light of the distinctness of the evidence and the trial judge's cautionary instructions, the jury cannot be said to have been confused and to have used evidence of still photos in determining questions related solely to moving pictures. See Stern v. United States, 409 F.2d 819, 820 (2d Cir. 1969);

United States v. Corallo, 413 F.2d 1306 (2d Cir. July 8, 1969). The trial court did not abuse its discretion in denying Saks' motions for severance.

Reversed.