20-3520-cr (L)
*United States v. Raniere*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this Court's Local Rule 32.1.1. When citing a summary order in a document filed with this Court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.**

   At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of December, two thousand twenty-two.

PRESENT:  GUIDO CALABRESI,
      JOSÉ A. CABRANES,
      RICHARD J. SULLIVAN,
          *Circuit Judges.*

---

UNITED STATES OF AMERICA,

     *Appellee*,

    v.                 20-3520-cr (L);
                      20-3789-cr (Con)

KEITH RANIERE, also known as Vanguard, and
CLARE BRONFMAN,

     *Defendants-Appellants*,

ALLISON MACK, KATHY RUSSELL, LAUREN
SALZMAN, and NANCY SALZMAN, also known
as Prefect,

     *Defendants.*[*]

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

**FOR APPELLEE:**                                    TANYA HAJJAR, Assistant United States
                                                     Attorney (Kevin Trowel, Assistant United
                                                     States Attorney, *on the brief*), *for* Breon
                                                     Peace, United States Attorney, Eastern
                                                     District of New York, Brooklyn, NY.


**FOR DEFENDANT-APPELLANT RANIERE:**    JOSEPH M. TULLY, Tully & Weiss
                                                     Attorneys at Law, Martinez, CA (Jennifer
                                                     Bonjean, Bonjean Law Group, PLLC,
                                                     New York, NY, *on the brief*).


**FOR DEFENDANT-APPELLANT BRONFMAN:**    RONALD S. SULLIVAN, JR., Ronald Sullivan
                                                     Law PLLC, Washington, DC (Daniel R.
                                                     Koffmann, Quinn Emanuel Urquhart, &
                                                     Sullivan, LLP, New York, NY, *on the brief*).

Appeal from judgments, entered October 7, 2020, and October 30, 2020, by the United States District Court for the Eastern District of New York (Nicholas G. Garaufis, *Judge*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the October 7, 2020 and October 30, 2020 judgments of the District Court be and hereby are **AFFIRMED**.

On March 13, 2019, a federal grand jury returned a Second Superseding Indictment ("Indictment") charging Defendant Keith Raniere with, inter alia, racketeering, sex trafficking, and a forced-labor conspiracy involving multiple victims. The Indictment also charged Defendant Clare Bronfman and others with a number of related crimes.

The Government alleged that Raniere was the founder of a self-styled executive coaching and self-help organization called NXIVM, and that Bronfman served on NXIVM's executive board. It further alleged that Raniere maintained a rotating group of female NXIVM members with whom he had sexual relationships. These women were barred from both having sexual relationships with anyone but Raniere and disclosing their relationship with Raniere to others.

As alleged, members of Raniere's "inner circle" would recruit vulnerable members of NXIVM to a secret society called "DOS," an acronym for "Dominus Obsequious Sororium," a phrase that roughly translates to "Lord/Master of the Obedient Female Companions." DOS was run as a pyramid organization, with Raniere on the top, followed by first-line "masters," and then "slaves." Apart from Raniere, all other DOS members were women. DOS "masters" would recruit "slaves" to the organization, who were required to deposit "collateral" to show their commitment to the organization in the form of, inter alia, sexually explicit photographs and videos depicting the

2

slaves in compromising positions, letters accusing loved ones of wrongdoing, and credit card authorizations. DOS "masters" would give their "slaves" assignments, which included uncompensated labor like buying groceries, cleaning, and organizing. DOS "masters" would also give their "slaves" assignments to engage in sexual acts with Raniere. DOS "slaves" who failed to comply with their "masters'" assignments risked the release of their "collateral."

Following a six-week jury trial, Raniere was convicted on all counts submitted to the jury.[1] He now raises various challenges to his convictions. Separately, Bronfman—who pleaded guilty to two counts prior to the commencement of Raniere's trial—brings a challenge to the procedural reasonableness of the District Court's imposition of an 81-month sentence for her crimes.

We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal. Raniere's appeal as it concerns his convictions for sex trafficking, attempted sex trafficking, and sex trafficking conspiracy, in violation of 18 U.S.C. § 1591—including both his challenges to the relevant jury instructions and his sufficiency-of-the-evidence arguments— is addressed in an opinion entered this same day. We write separately here to address Raniere's remaining claims as well as Bronfman's appeal, and address each in turn.

## I. RANIERE'S APPEAL

### A. Sufficiency-of-the-Evidence Challenges

Raniere first argues that insufficient evidence was presented to the jury to sustain his convictions for various counts. Where, as here, claims of insufficiency are preserved below, we review those claims *de novo*. *United States v. Capers*, 20 F.4th 105, 113 (2d Cir. 2021). A defendant challenging the sufficiency of the evidence at trial "face[s] a heavy burden because we must sustain the jury's verdict if, crediting every inference that could have been drawn in the government's favor

---

[1] We refer to the counts as they appear on the verdict sheet: racketeering conspiracy (Count 1); racketeering (Count 2); forced labor conspiracy (Count 3); wire fraud conspiracy (Count 4); sex trafficking conspiracy (Count 5); sex trafficking of Nicole (Count 6); and attempted sex trafficking of Jay (Count 7). The jury found that the Government had proved all of the racketeering acts alleged on the verdict sheet: conspiracy to commit identity theft – Ashana Chenoa (Act 1A); conspiracy to unlawfully possess identification document (Act 1B); sexual exploitation of a child on November 2, 2005 – Camila (Act 2); sexual exploitation of a child on November 24, 2005 – Camila (Act 3); possession of child pornography (Act 4); conspiracy to commit identity theft (Act 5A); identity theft – James Loperfido (Act 5B); identity theft – Edgar Bronfman (Act 5C); conspiracy to alter records for use in an official proceeding (Act 6); conspiracy to commit identity theft – Marianna (Act 7); trafficking for labor and services – Daniela (Act 8A); document servitude – Daniela (Act 8B); extortion (Act 9); sex trafficking – Nicole (Act 10A); forced labor – Nicole (Act 10B); and conspiracy to commit identity theft - Pamela Cafritz (Act 11).

3

and viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020)).

We address Raniere's numerous sufficiency claims below.

### a. Forced Labor and Forced Labor Conspiracy, in Violation of 18 U.S.C. § 1589 (Count 3 and Racketeering Act 10B)

In challenging the sufficiency of the evidence on the forced labor conspiracy charge (Count 3) and the racketeering act of forced labor of Nicole (Act 10B),[2] Raniere argues (1) that the "acts of service" that Nicole conducted for Allison Mack were "isolated personal favors and kind gestures" that do not rise to the definition of "labor or services" used in the statute, 18 U.S.C. § 1589; and (2) that Nicole had "knowingly consented to these types of activities as part of her membership in DOS." Raniere's Br. 33. We find neither argument convincing.

As to the first argument—that Nicole's "acts of service" do not rise to the level of "labor or services" as that term is used in Section 1589—we begin by looking to the "ordinary meaning" of the statutory phrase "labor or services." *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010). Labor includes the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory." *Id.* at 44 n.10 (quoting Merriam-Webster's Third New International Dictionary Unabridged (2002)). Here, evidence presented to the jury showed that DOS "slaves" were coerced into providing uncompensated work by the threat of the release of their "collateral." In particular, the Government offered evidence at trial that Nicole provided uncompensated work for Mack, including transcribing tapes and reviewing articles. **[Gov. App'x 786.]** Thus, we conclude that "the plain meaning of the forced labor statute unambiguously applies to [Raniere's] conduct." *Id.* at 45.

The second argument—that Nicole had consented to the labor—is also unconvincing. "The fact that [Nicole's] enslavement arose from her initial participation in consensual [DOS] activities does not require" us to infer, much less conclude, that Nicole consented to all of the labor she subsequently undertook. *See id.* At trial, the Government presented evidence that Nicole was required to produce "collateral," including in the form of sexually explicit videos of herself, letters in which she falsely accused her father of sexual abuse, and credit card authorization forms, which she feared would be released if she failed to comply with Mack's directives. **[Gov. App'x 738–40.]** Upon review of the record, we conclude that the jury was presented with ample evidence showing

---

[2] The District Court ordered that during trial, certain witnesses only be referred to by first name or pseudonym. We address the propriety of the District Court's order *post*.

4

that Nicole's labor was nonconsensual. There is therefore no basis for overturning the forced labor or forced labor conspiracy convictions.

**b. Sexual Exploitation of a Child, in Violation of 18 U.S.C. § 2251 (Racketeering Acts 2 and 3)**

Raniere argues that the Government failed to prove the racketeering acts of child exploitation of Camila (Racketeering Acts 2 and 3), principally pointing to the fact that Camila did not testify at trial. Raniere argues that, at most, his possession of explicit photographs dated November 2, 2005 and November 24, 2005 shows that he was guilty of mere *possession* of child pornography. He argues that no evidence was presented specifically showing that he "employ[ed], use[d], persuade[d], induce[d], entice[d], or coerce[d]" Camila to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2251. *See* Raniere's Br. 36–37.

We do not agree. Even without Camila's testimony, the jury was presented with ample evidence showing that Raniere began sexually abusing Camila in September 2005. *See, e.g.*, Gov. App'x 710-1–10-4, 1171, 1268 (emails and text messages between Camila and Raniere referring to the beginning of their sexual relationship as around September 2005); Gov. App'x 416–17 (testimony from Daniela that she had spoken to Raniere about his sexual relationship with Camila at some point before the fall of 2006). Moreover, the jury was shown messages between Camila and Raniere specifically referencing Raniere's creation and possession of the November 2005 photographs. *See, e.g.*, Gov. App'x 1173. And the electronic folder containing the photographs of Camila also contained nude photographs of other women with whom Raniere had a contemporaneous sexual relationship. In sum, the jury was presented with sufficient evidence to conclude beyond a reasonable doubt that Raniere was guilty of sexually exploiting Camila.

**c. Conspiracy to Alter Records for Use in an Official Proceeding, in Violation of 18 U.S.C. § 1512(c)(1) (Racketeering Act 6)**

Next, Raniere argues that the Government did not prove the existence of a conspiracy to alter records for use in an official proceeding (Act 6). He concedes that the Government offered evidence that Mark Vincente, one of Raniere's alleged co-conspirators, altered or arranged for the alteration of certain video tapes—which were produced in discovery as part of a federal civil action, *NXIVUM Corp., et al., v. Ross Institute, et al.*, No. 06-CV-1051 (D.N.J.)—at Raniere's direction. Raniere's Br. 40. But he argues that the Government did not provide sufficient evidence to prove that Vicente acted with the requisite intent. We disagree.

For the Government "to satisfy the element of intent," it "must show a 'nexus' between the defendant's act and the judicial proceedings; that is, there must be 'a relationship in time, causation, or logic' such that the act has 'the natural and probable effect of interfering with the due administration of justice.'" *United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013) (quoting *United*

*States v. Aguilar*, 515 U.S. 593, 599–600 (1995)).  At trial, Vincente testified that he knew the deleted content of the tapes would have been damaging to NXIVM in an ongoing "legal action" and that he understood the alteration of the videos to be "illegal."  Gov. App'x 178–79, 182.  The jury was thus presented with sufficient evidence to conclude that the intent element was satisfied.

### d. Identity Theft Conspiracy, in Violation of 18 U.S.C. § 1028 (Racketeering Act 11)

Raniere also challenges the sufficiency of the Government's evidence as to Racketeering Act 11, which charged Raniere with conspiring to commit identity theft in connection with tax evasion, in violation of 18 U.S.C. § 1028(a)(7) and 1028(f).  In particular, the Government charged Raniere with using the credit card of Pamela Cafritz—his long-term partner who had since died—in order to evade his tax obligations.  [**Gov. App'x 17.**]  Raniere argues that the Government offered no evidence that he had a substantial tax debt or that he ever failed to pay his taxes, as required to prove a substantial violation of the tax evasion statute.  Raniere's Br. 43–44; *see also United States v. Litwok*, 678 F.3d 208, 215 (2d Cir. 2012) (listing elements of a substantive violation of 26 U.S.C. § 7201).

Raniere misapprehends the import of the identity theft statute.  Section 1028 prohibits "knowingly . . . us[ing], without lawful authority, a means of identification of another person with the *intent to commit*, or *to aid or abet*, or *in connection with*, any unlawful activity that constitutes a violation of Federal law . . . ."  18 U.S.C. § 1028(a)(7) (emphasis added).  As the District Court explained in its jury instructions, "the Government does not need to prove that [Raniere] or a co-conspirator actually committed tax evasion."  Jury Charge at 108, *United States v. Mack*, No. 18-CR-204 (NGG) (E.D.N.Y. June 18, 2019), ECF No. 728.  Upon review of the record, we conclude that the Government offered sufficient evidence from which the jury was able to conclude that Raniere entered into a conspiracy to use Cafritz's credit card with the intent to commit, or to aid or abet, or in connection with, tax evasion.[3]

### e. Racketeering and Racketeering Conspiracy, in Violation of 18 U.S.C. § 1962(c) (Counts 1 and 2)

Finally, Raniere argues that his conviction for a racketeering conspiracy (Count 1) and substantive racketeering (Count 2) cannot be sustained because (1) there was insufficient evidence

---

[3] To the extent Raniere also contends that there was not sufficient evidence for the jury to find that he acted without lawful authority when using Cafritz's credit card because he was the executor and sole beneficiary of Cafritz's estate, *see* Raniere Br. 42, we are unpersuaded.  Raniere does not present a developed argument explaining why being the executor and beneficiary of an estate gives one lawful authority to use a deceased person's credit card.

that Raniere's "inner circle" constituted an enterprise for RICO purposes and (2) the Government failed to demonstrate a "pattern" of related racketeering activities as opposed to isolated and sporadic offenses. Raniere's Br. 15–16. We are not convinced by either argument.

The RICO statute prohibits persons "employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

Raniere first argues that there was insufficient evidence that Raniere's "inner circle" was an "enterprise" for RICO purposes. In particular, he argues that the "inner circle" did not share a "common purpose" other than a vague commitment and loyalty to Raniere. Raniere's Br. 47–48. But the Indictment alleges that the purpose of the enterprise was "to promote [Raniere] . . . *and* to recruit new members into the Pyramid Organizations [*i.e.*, NXIVM and DOS]," whereby existing members of the enterprise "expected to receive financial opportunities and personal benefits, including increased power and status within the Enterprise." Gov. App'x 2–3, ¶ 4 (emphasis added). The Government presented evidence at trial that members of the enterprise recruited members into Raniere's organizations and received such benefits. **[*See, e.g.*, Gov. App'x 198.]**

To the extent that Raniere objects to the informal nature of the "inner circle's" membership, *see, e.g.*, Raniere's Br. 49 (arguing that the inner circle "was nothing more than a hodgepodge of people from a wider community"), the Supreme Court has rejected the argument that RICO enterprises must have formal membership or structural requirements, instead emphasizing the "breadth of the 'enterprise' concept in RICO." *Boyle v. United States*, 556 U.S. 938, 948–49 (2009); *see also* 18 U.S.C. § 1961(4) (defining enterprise as including "any . . . group of individuals associated in fact although not a legal entity"); *United States v. Eppolito*, 543 F.3d 25, 49 (2d Cir. 2008) ("An 'individuals associated in fact' enterprise, 18 U.S.C. § 1961(4), may continue to exist even though it undergoes changes in membership."). Upon review of the record, we are satisfied that the evidence presented at trial established that the "inner circle" was an enterprise for purposes of the RICO statute.

Next, Raniere argues that the Government failed to establish a "pattern of racketeering activity" as that term is used in Section 1962(c). The statute requires that there be "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). "[C]riminal conduct forms a pattern of racketeering activity under RICO when it 'embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989)). Relatedness includes both horizontal relatedness—that the predicate acts are related to each other—and vertical relatedness—that the predicate acts are related to the enterprise. *Id.* "[B]oth the vertical and horizontal relationships are generally satisfied by linking each predicate act to the enterprise." *Id.* at 376.

Here, the evidence presented at trial permitted the conclusion that the eleven predicate acts listed in the Indictment were linked to the enterprise. In arguing otherwise, Raniere arbitrarily groups the eleven predicate acts into three sub-groups: (1) the DOS Acts (Acts 9 and 10); (2) the sexual exploitation and possession of child pornography of Camila (Acts 2, 3, and 4); and (3) non-DOS Acts (Acts 1, 5, 6, 7, 8, and 11). Raniere's Br. 55–63. But this grouping does not defeat the conclusion that each of these acts was linked to the enterprise. *See United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010) ("Horizontal relatedness requires that the racketeering predicate acts be related to each other. However, that relationship need not be direct; an indirect relationship created by the relationship of each act to the enterprise will suffice." (citing *United States v. Polanco*, 145 F.3d 536, 541 (2d Cir. 1998))). In sum, we find that there was sufficient evidence presented at trial to sustain Raniere's RICO convictions.

### B. Rule 403 Challenges

Raniere next challenges the District Court's decision to allow the introduction of three categories of evidence: (1) communications between Raniere and Camila; (2) evidence that Camila, Daniela, and Marianna had abortions after being impregnated by Raniere; and (3) photographs of women's genitalia taken by Raniere. **[Raniere's Br. 64.]** He argues that these materials should have been excluded as unduly prejudicial under Federal Rule of Evidence 403. We disagree.

Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We have frequently noted that we review a district court's balancing under Rule 403 for abuse of discretion. *See, e.g.*, *United States v. Polouizzi*, 564 F.3d 142, 152 (2d Cir. 2009). "The 'decision to admit or exclude evidence will not be overturned unless we conclude that the court acted arbitrarily or irrationally.'" *Id.* (quoting *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994)).

#### a. Communications Between Raniere and Camila

Raniere first challenges the admission of WhatsApp messages between Raniere and Camila, which he argues were of minimal probative value, contained "gratuitous sexually-graphic conversations," and portrayed Raniere as "manipulative, controlling[,] and emotionally abusive." Raniere's Br. 68, 71. But as Raniere himself acknowledges, the communications are "relevant to support the [G]overnment's claim that [Raniere] began a sexual relationship with Camila when she was 15 years old and that [he] was the architect of DOS." *Id.* at 71 (citation omitted). These communications were highly probative of Raniere's relationship with Camila, whom the Government argued was both a victim of Raniere's child exploitation and a "slave" in DOS.

8

Accordingly, the District Court's decision to admit these communications was far from "arbitrar[y] or irrational[]." *Polouizzi*, 564 F.3d at 152 (quoting *Thai*, 29 F.3d at 813).[4]

### b. **Abortion Evidence**

Raniere next challenges the District Court's decision to admit evidence—in the form of testimony, medical records, and ultrasound images—that Daniela, Camila, and Marianna had obtained abortions, arguing that such evidence was prejudicial, cumulative, and minimally probative. Raniere's Br. 74. But the abortion material was probative of Raniere's sexual relationship with Camila when she was a minor and to show that Cafritz—who was a member of the charged enterprise and helped procure the abortions—facilitated the abuse of Camila and Daniela. We see no error in the District Court's decision to admit the abortion evidence.

### c. **Photographs of Women's Genitalia**

Finally, Raniere challenges the District Court's decision to admit 167 photographs of women's genitalia recovered from a hard drive also containing explicit images of Camila taken when she was a minor. He argues that the evidence was cumulative and highly prejudicial. Raniere's Br. 78. But elsewhere, Raniere argues that the existence of explicit images of Camila on the hard drive is not sufficient to establish that it was Raniere who took the photographs of Camila. *See id.* at 35. Thus, even he must concede that the "timeframe in which the . . . photos w[ere] taken shed[s] some light on the question of whether [Raniere] was responsible for taking the Camila photos." *Id.* at 77. The existence of the photographs of other women's genitalia—women with whom Raniere had a contemporaneous sexual relationship—was probative of whether Raniere had taken the photographs of Camila and whether he had had a sexual relationship with her while she was a minor. The District Court did not err in deciding to admit the evidence.

## C. **Other Trial-Related Challenges**

Raniere also raises two separate challenges concerning trial orders. We address each below.

### a. **Prohibition on the Use of Full Names**

Prior to the commencement of trial, upon motion by the Government, the District Court ordered that "testifying victims" were to be identified by "a nickname, first name, or pseudonym only" and that "non-testifying DOS victims" were to be "referred to solely by first name or

---

[4] The Government argues that Raniere's objections to the WhatsApp messages were not raised below and should therefore be evaluated for plain error only. We need not decide whether or not Raniere's objections were preserved because, even if they were, we conclude that the District Court did not abuse its discretion in admitting the evidence.

nickname" during trial. Memorandum & Order at 40, *Mack*, No. 18-CR-204 (May 6, 2019), ECF No. 622. Raniere argues that this decision violated his rights under the Confrontation Clause of the Sixth Amendment and his due process rights under the Fifth Amendment. **[Raniere's Br. 85–86.]** We disagree.

A defendant's constitutional right to confront witnesses includes the right to "ask the witness who he is and where he lives," because, "when the credibility of a witness is in issue," these questions are "the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination." *Smith v. State of Illinois*, 390 U.S. 129, 131 (1968) (quoting *Pointer v. Texas*, 380 U.S. 400, 404 (1965)); *see also Alford v. United States*, 282 U.S. 687, 689 (1931). The Second Circuit has explained that there are "two central interests" safeguarded by *Smith* and *Alford*. "First, the defense needs testimony as to a witness' [identity] on cross-examination so that the defense can obtain this information which may be helpful in investigating the witness out of court or in further cross-examination." *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970). "Second, the defense may need the witness to reveal his address [or other identifying information] in court because knowledge of the [identifying information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability." *Id.*

That said, a district court's decision to limit the scope of cross-examination is reviewed for abuse of discretion. *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012). Trial judges have "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). And "[e]ven if a reviewing court finds error, a new trial is not required if the error was harmless." *White*, 692 F.3d at 244.

Here, in granting the Government's request to prohibit the use of full names, the District Court reasoned that requiring victims to provide their names in public "could chill their willingness to testify, for fear of having their personal histories publicized." Memorandum & Order at 32, *Mack*, No. 18-CR-204 (May 6, 2019), ECF No. 622. It also found that Raniere failed to present a particularized need for the witnesses' last names to be disclosed, since he already knew the identity of the individuals and could articulate no reason why disclosing last names would help the jury assess the witnesses' credibility. As for Raniere's contention that the withholding of the witnesses' last names bolstered their credibility by effectively endorsing their status as victims, the District Court correctly addressed this concern with an appropriate jury instruction. *Id.* at 32–34.[5] Under

---

[5] During trial, the District Court instructed the jury that it should "not make any inferences as to the defendant's guilt or non-guilt from the fact that certain last names are being withheld from [the jury] and the public." Gov. App'x 112; *see also United States v. Reichberg*, 5 F.4th 233, 244 (2d Cir. 2021) ("We presume that juries follow limiting instructions.") (cleaned up).

these circumstances, where neither of *Marti*'s two "central interests" are implicated, the District Court's decision was justified, and we see no error in it. 421 F.2d at 1266; *see also Marcus*, 628 F.3d at 45 n.12 (rejecting a similar challenge to a lower court's "decision permitting two of the Government's witnesses to testify using only their first names" on due process grounds).

### b. Termination of Cross-Examination

Raniere also argues that the District Court's improperly terminated Lauren Salzman's cross-examination, again allegedly violating his Sixth Amendment right to confront his accuser and his Fifth Amendment right to due process. We conclude that—even assuming the District Court erred in its termination of the cross-examination—any such error was harmless.

During the lengthy cross-examination of Lauren Salzman—a cooperating Government witness who had previously pleaded guilty to racketeering charges—the District Court ordered that the cross-examination end, saying in front of the jury: "[t]hat's it. We are done." Gov. App'x 396. After the jury was excused, defense counsel objected and the District Court explained that counsel had gone "way over the line," and that he "kept coming back" to a line of questions concerning whether Lauren Salzman had actually had the requisite mental state to have committed the crimes to which she had pleaded guilty. *Id.* The District Court explained that it would not tolerate "someone hav[ing] a nervous breakdown on the witness stand," noted that Lauren Salzman was "a broken person," and expressed concern over Lauren Salzman's "composure." *Id.* at 396–97.

Here, any arguable error was harmless. Raniere vaguely asserts that he was precluded from crossing Lauren Salzman on a range of topics, including: (1) the impact of her potential jail term on her decision to cooperate; (2) "certain other facts" she learned in discovery that caused her to change her view of Raniere and DOS; (3) "certain specific portions" of recordings she heard of meetings between Raniere and other DOS members; and (4) "other aspects" of her plea agreement and her cooperation. Raniere's Br. 81. But Raniere fails to provide any further detail about these potential questions or explain how the inability to address them—after an already lengthy cross-examination that included many questions on related topics—deprived him of his ability to test the veracity of Lauren Salzman's testimony. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273, 313 (2d Cir. 2006).

Furthermore, after the District Court terminated counsel's cross-examination of Lauren Salzman and at the close of the Government's case-in-chief, the Government stated—and Raniere's counsel confirmed—that the Government had "offered to the defense to make any of its witnesses available" to testify at Raniere's case-in-chief, "including Lauren Salzman," and that Raniere had not elected to avail himself of that opportunity and declined to put on a case. Gov. App'x 976. Under these particular circumstances, we conclude Raniere "suffered no harm" from the District Court's prior decision to cut off Lauren Salzman's cross-examination. *Cf. United States v. Barbarino*, 612 F. App'x 624, 627 (2d Cir. 2015) (summary order) (concluding that any error in limiting defendant's

cross examination of a witness was harmless where "[t]he Government offered to make [the witness] available for further cross-examination by telephone" and "Barbarino has not identified other questions he was prevented from asking on cross-examination").

## II. BRONFMAN'S APPEAL

On April 19, 2019, Bronfman pleaded guilty to two counts: (1) conspiracy to conceal, harbor, and shield from detection one or more aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and (a)(1)(B)(i); and (2) unlawful transfer and use of a means of identification of another person with the intent to commit and in connection with attempted tax evasion, in violation of 18 U.S.C. § 1028(a)(7), 1028(b)(1)(D), and 1028(c)(3)(A). At sentencing, the District Court determined that the applicable advisory Guidelines sentencing range was 21 to 27 months' imprisonment and imposed a sentence of, *inter alia*, 81 months' imprisonment. Bronfman now argues that the District Court committed procedural error.

We review a district court's imposition of a sentence under a "deferential abuse-of-discretion standard." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)); *see also In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (describing the abuse-of-discretion standard). The imposition of a sentence outside of the advisory Guidelines range does not alter the standard of review. *Gall*, 552 U.S. at 49. At root, we evaluate the sentence imposed for "reasonableness," a concept which includes "the procedures used to arrive at the sentence (procedural reasonableness) . . . ." *United States v. Broxmeyer*, 699 F.3d 265, 278 (2d Cir. 2012). Procedural error includes "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51.

Bronfman principally argues that the District Court committed procedural error by relying on a "clearly erroneous finding"—namely that Bronfman was aware of, or willfully blind to, Raniere's abuses in DOS. Bronfman's Br. 22. We disagree. The District Court explicitly stated that it "agree[d] with Ms. Bronfman that the available evidence does not establish that she was aware of DOS prior to June 2017[6] or that she directly or knowingly funded DOS or other sex trafficking activities." Sp. App'x 104. It acknowledged, however, that her "crimes were not committed in a vacuum." *Id.* And it found "most troubling" that when, in 2017, Bronfman was "confronted with information about DOS . . . she doubled down on her support of Raniere and pursued her now familiar practice of attacking his critics." *Id.* at 118–19. The District Court referred to a December

---

[6] The District Court concluded that, at the latest, Bronfman learned of the existence of DOS in June 2017, when she received emails from former DOS "slaves" who asked her to return or destroy their digital "collateral." Sp. App'x 104. No party disputes this fact.

2017 public statement that Bronfman released in which "she falsely characterized DOS as a 'sorority' that 'truly benefited the lives of its members.'" *Id.* at 122–23. And it discussed Bronfman's contribution of $13.8 million to an irrevocable trust to pay for the legal fees of Raniere and her other co-defendants. *Id.* at 124. It is in this context that the District Court stated that Bronfman had a "pattern of willful blindness when it comes to Raniere and his activities," and that although Bronfman may not have known of DOS before 2017, "she did not want to know either." *Id.* at 125–26. A full reading of the District Court's lengthy statement (which covers thirty pages of the transcript) shows that it was primarily concerned with Bronfman's actions *after* she found out about DOS in June 2017, including her reinvigorated support of Raniere.

Bronfman also argues that the District Court ignored disparities between her sentence and the sentences imposed on her co-defendants—Mack, Lauren Salzman, and Kathy Russell—in violation of 18 U.S.C. § 3553(a)(6). Section 3553(a)(6) requires a district court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." But as we have made clear, while "[S]ection 3553(a)(6) requires a district court to consider nationwide sentence disparities," it "does not require a district court to consider disparities between co-defendants." *United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (quoting *United States v. Frias*, 521 F.3d 229, 236 (2d Cir. 2008)). In any event, Bronfman's conduct—before and after her indictment—readily distinguishes her from Mack, Salzman, and Russell, two of whom cooperated with the Government and received sentencing reductions pursuant to 18 U.S.C. § 3553(e).

Finally, Bronfman argues that even compared to defendants nationwide, her 81-month sentence was excessive. She points to certain statistics showing that of 27 defendants convicted of both 8 U.S.C. § 1324 and 18 U.S.C. § 1028 offenses nationwide, none received an above-Guidelines sentence. Bronfman's Br. 27. She has filed a motion to supplement the record with the reports she relied on in arriving at that conclusion, ECF No. 183, and that motion is hereby GRANTED. Even so, as the District Court pointed out, "the context of Ms. Bronfman's criminal conduct places her in an[] all together different category from other defendants convicted of the same offenses." Sp. App'x 129. Upon review of the record, including the material contained in ECF No. 183 and its supporting documents, we find that the District Court acted well within its discretion in arriving at its conclusion.

## III. CONCLUSION

To summarize:

(1) Bronfman's motion to supplement the record, ECF No. 183, is hereby **GRANTED**.
(2) Having considered all of Bronfman's remaining arguments and found them to be without merit, for the foregoing reasons, we **AFFIRM** the October 7, 2020 judgment of the District Court.

13

(3) Having considered all of Raniere's remaining arguments and found them to be without merit, for the foregoing reasons, and for the reasons explained in our opinion also entered today—affirming the District Court's judgment of conviction entered on October 30, 2020 as it concerns the sex trafficking conspiracy (Count 5), the sex trafficking of Nicole (Count 6), the attempted sex trafficking of Jay (Count 7), and the racketeering act of sex trafficking of Nicole (Act 10A)—we **AFFIRM** all other portions of the October 30, 2020 judgment of the District Court, including, but not limited to, the racketeering conspiracy (Count 1), the racketeering (Count 2), the sexual exploitation of a child – Camila (Acts 2 and 3), the conspiracy to alter records for use in an official proceeding (Act 6), the forced labor of Nicole (Act 10B), the conspiracy to commit identity theft of Pamela Cafritz (Act 11), and the forced labor conspiracy (Count 3).

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court